UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>25-60011-CR-WPD</u>

**UNITED STATES OF AMERICA**

vs.

**STEPHEN GEORGE,**

    **Defendant.**
_____/

**THE UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM**

Animated by greed, defendant Stephen George traded on material non-public information ("MNPI") that he stole from his employer. He defrauded the securities markets out of over $1.6 million for his own personal benefit. The nature and circumstances of the Defendant's offense, the need to promote respect for the law, and general deterrence all demand a Guidelines sentence. Below we provide a factual overview, address the Defendant's two objections to his Presentence Investigation Report, and identify the critical factors under 18 U.S.C. § 3553(a).

## I. FACTS

The Defendant began working at Company A in November 2017. (¶ 21.)[1] The Defendant was hired to serve as Controller and formerly took over as a Vice President and Controller in or about early 2018. For over five years, the Defendant helped lead Company A's expanding Finance department as the company's revenue grew twentyfold. (CEL-DOJ-00000011.)

### a. Company A's Insider Trading Policy Prohibited the Defendant's Conduct.

At all times relevant to the Defendant's offense conduct, Company A maintained an Insider Trading Policy that expressly prohibited the Defendant's unlawful insider trading. Two separate restrictions addressed his conduct. *First*, all Company A employees, regardless of position, were prohibited from trading in Company A securities based on MNPI regarding the company. (CEL-DOJ-00000057.) The policy's first example of "material information" on which an employee was proscribed from trading was "[u]npublished financial results[.]" *Second*, a heightened trading restriction was imposed on the company's senior employees—including the Defendant—who were considered members of the "control group," which consisted of "[a]ll directors of the Board, officers of [Company A],

---

[1] References are to the Defendant's Presentence Investigation Report (Dkt. No. 20) unless otherwise stated.

employees at VP and director level, [and] all employees reporting directly to the Chief Financial Officer…." (*Id.*) Control group members were completely prohibited from trading in Company A securities during certain "black-out periods," which generally spanned several weeks before the company's public earnings reports through two full trading days after.[2]

### b. The Defendant Resigned from Company A as Vice President and Controller.

On or about March 27, 2023, the Defendant submitted his resignation in response to personnel changes within the company's Finance department. (CEL-DOJ-00008109.) In an email to the company's Chief Executive Officer and Chief Financial Officer, and copied to the head of Human Resources—and no one else—the Defendant wrote that "[o]n certain occasions, my contribution to the team is overlooked and not valued. On many occasions, there has been discrimination between members of the old and new teams, and at this phase in my career it's not something I am looking forward to dealing with." (*Id.*) The Defendant selected his final day of employment to be April 7, 2023, which fell within a blackout period for members of the control group discussed above. The Defendant's signature block in his resignation email stated: "Stephen George VP, Corporate Controller[.]" (CEL-DOJ-00008109.) Upon news of the Defendant's resignation, the company's CFO emailed 18 of the company's most senior executives, including the company's CEO and General Counsel, to notify them of the Defendant's resignation and to invite them to a lunch "to celebrate Stephen's contribution over the years." (CEL-DOJ-00000011.)[3]

---

[2] In addition to the Insider Trading Policy, Company A also had a Code of Ethical Conduct that specifically prohibited insider trading. (¶ 22.)

[3] Additional evidence confirms that the Defendant served as Vice President and Controller until his departure. On March 8, 2023, the Defendant testified under oath before the U.S. Securities & Exchange Commission ("SEC") and stated that he was the Controller of Company A. He further testified that he had at least two direct reports, who in turn had additional direct reports. On March 6, 2023, in advance of his SEC testimony, the Defendant submitted a background questionnaire to the SEC that included his

### c. The Defendant Received, and Affirmatively Stole, Company A's MNPI.

During the pendency of his resignation, the Defendant continued to receive emails containing MNPI regarding Company A's financial performance. For example, on March 29, 2023, the Defendant received from the company's Financial Planning & Analysis Manager non-public month-end financials for February 2023. (CEL-DOJ-00000197.) The email's attachment stated that Company A's income was more than four times better than forecasted. (*Id*.) The email was sent only to a limited number of Company A employees, including the Defendant, the company's CEO, the CFO, the Senior Vice President of Finance, and the SEC Manager. (*Id*.)

On April 7, 2023, his last day of employment, the Defendant stole MNPI from Company A regarding its first quarter results. Specifically, the Defendant used his company-issued laptop to generate out of Company A's enterprise resource planning system an Excel file that contained the company's consolidated income statement for the three months ending March 31, 2023. (¶ 25; Factual Proffer ¶ 7.) The report showed that Company A's first quarter financial results had greatly exceeded expectations, including that gross profit in March 2023 had more than tripled as compared to March 2022. Shortly after generating the report, the Defendant emailed the Excel file to himself. (¶ 25.) Rather than use his Company A email account, the Defendant logged into Gmail Account 1 (a personal account which he controlled) and sent the Excel file from Gmail Account 1 to Gmail Account 2 (a second personal account which the Defendant also controlled). (*Id*.) The Defendant later deleted the email from Gmail Account 2. (*Id*.)

---

employment history and identified the Defendant's job title at Company A as "Controller" during the period "11/28/2017 to Current." Finally, a Company A organizational chart dated March 1, 2023, the month the Defendant resigned, listed the Defendant as "VP Controller." (CEL-DOJ-00000008.)

### d. The Defendant Unlawfully Traded Based on the Stolen MNPI.

On Monday, April 10, 2023, the first trading day after the Defendant's employment at Company A ended, and continuing through May 8, 2023, the Defendant purchased 20,000 shares of Company A based on the MNPI that he stole from Company A. (¶ 26.) The price per share ranged from $85.72 to $106.45. The Defendant also purchased a series of Company A call options based on the same stolen MNPI. (¶ 27.) Specifically, the Defendant purchased 300 call options contracts (200 contracts on April 13, 2023, and 100 contacts on April 20, 2023) at a total cost of over $82,000 that were set to expire on May 19, 2023, and had strike prices of $95, $100, and $105 (100 contracts at each price).[4] Accordingly, for the Defendant to profit on these options trades, the stock price of Company A had to rise between 15 and 25% within the next 4-5 weeks to be above the strike prices of the call options; otherwise, the options would expire worthless. Put another way, the Defendant risked over $82,000 on the bet that Company A's stock price would rise significantly in a very short period of time—an extremely risky trade unless, like the Defendant, one had MNPI showing the company vastly exceeding its current financial performance expectations.

On May 9, 2023, after the close of the market, Company A publicly reported better than expected earnings and sales for the quarterly period ending March 31, 2023, including an all-time quarterly record revenue. (*Id.*) This financial performance mirrored the results that the Defendant had surreptitiously accessed and sent himself on April 7, 2023. After the news of Company A's financial performance became public, its stock price went up significantly. (¶ 27.) The next trading day, the Defendant sold the Company A stock and options he had purchased on the basis of MNPI, resulting in a profit from his

---

[4] On April 13, 2023, the Defendant purchased 100 Company A May 19, 2023 $95 call options at $4.00 per contract; and 100 Company A May 19, 2023 $105 call options at $1.75 per contract. (¶ 27.) On April 20, 2023, the Defendant purchased 100 Company A May 19, 2023 $100 call options at $2.50 per contract. (*Id.*)

unlawful trading of $1,682,801.66.  (¶ 28.)

Separate and apart from the Defendant's insider trading scheme described above, as of April 10, 2023, the Defendant owned approximately 27,595 shares of Company A common stock, worth approximately $2.3 million and held in the Defendant's Merrill Lynch brokerage account.  As of May 10, 2023, the first trading day after Company A publicly reported better than expected earnings and sales for the first quarter of 2023, the value of these 27,595 shares was approximately $3.5 million, representing an approximately $1.2 million increase since April 10, 2023.

### e. The Defendant Did Not Seek Alternative Employment & Denied to Law Enforcement That He Traded in Company A Securities on the Basis of MNPI.

The Defendant did not look for work upon his departure from Company A, nor has he found employment since.  Rather, with proceeds from the scheme, the Defendant purchased a triplex rental property he manages.

On April 25, 2024, accompanied by counsel, the Defendant met with law enforcement and falsely denied trading in Company A stock and options on the basis of MNPI.

## II. THE DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT SHOULD BE OVERRULED.

The Defendant filed two objections to his PSR, claiming that Probation miscalculated his "gain" from the offense and that he did not abuse a position of trust.  Both objections should be overruled.

### a. The Defendant's "gain" was the total proceeds from his illegal insider trading.

The insider trading guidelines require that a defendant's offense level be enhanced by the "gain resulting from the offense."  U.S.S.G. § 2B1.4(b)(1) (instructing the court to increase the defendant's offense level "by the number of levels from the table in § 2B1.1").  The background commentary to § 2B1.4 states, "Because the victims and their losses are difficult if not impossible to identify, the gain, i.e., the total increase in value realized through trading in securities by the defendant . . . is employed

6

instead of the victims' losses."

It is undisputed that the Defendant netted $1,682,801.66 from his insider trading scheme. (¶ 29.) Applying the plain and ordinary meaning of the Guidelines, the Defendant's "gain" was, therefore, $1,682,801.66. *See United States v. Isaac*, 987 F.3d 980, 991 (11th Cir. 2021) ("[T]he language of the Guidelines is given its 'plain and ordinary meaning.'") (quoting *United States v. Tham*, 118 F.3d 1501, 1506 (11th Cir. 1997)). Numerous courts have held that where an insider trader purchases securities in advance of positive MNPI, and sells those securities soon after disclosure of that MNPI, his gain equals his net proceeds for purposes of the Sentencing Guidelines. *See, e.g., United States v. Federico Nannini*, 24-20398-RUIZ (S.D. Fla.) (calculating defendants' gain as the net proceeds derived from trading on positive MNPI in advance of corporate acquisition); *United States v. Rajaratnam*, 2012 WL 362031 (S.D.N.Y. 2012) (holding that for instances in which defendant traded on positive MNPI in advance of disclosure, and sold those securities around the time of disclosure, ". . . the plain meaning of 'increase in value' [as used in the Guidelines] is the difference between the purchase and sale price. . . "); *United States v. Stephen Buyer*, 22-CR-397 (S.D.N.Y.) (former congressman's "gain" equaled net proceeds when he traded on MNPI in advance of two corporate acquisitions); *United States v. Tyler Loudon*, 24-CR-57 (S.D. Tex.) ("gain" equaled net proceeds for husband who eavesdropped on wife's work calls and traded in advance of public disclosures and sold shortly thereafter).

The Defendant disagrees. He claims that the appreciation in Company A's stock price between the time he purchased the shares and the day before the company's quarterly results were disclosed must be excluded as "the effect of general market conditions and other external market forces on the publicly traded stock price." (Def. Obj. p. 2.) In so doing, he tries to calculate not his "total increase" from trading on the MNPI, but rather the value of the MNPI itself. Such an approach conflicts with the

7

Guidelines and fails to capture the extent of his wrongdoing.  The objection must be overruled.

In *United States v. Rajaratnam*, at sentencing after being convicted at trial for insider trading, a hedge fund manager put forward an expert witness whose "event study" used "a statistical regression analysis" to "isolate the price increase or decrease in a company's stock attributable to the public announcement of inside information[.]" 2012 WL 362031 at *3.  The hedge fund manager argued that the court should use the expert's analysis for purposes of calculating "gain" under the Guidelines.  *Id*.  The court refused.  Instead, it used the defendant's net proceeds: "the difference between the price at which a security was purchased []on the basis of inside information, and the price at which it was later sold[.]" *Id*. at *1.  In so doing, the court reasoned that the Guidelines "commentary refers to the 'value realized through trading in securities' not the value of the information used to do the trading.  And the plain language of the 'value realized through trading in securities' is the increase in the price of stock from the time that the defendant purchased it to the time he sold it." *Id*. at *7.  The court further explained that, while it is true that trading in securities is generally legal, and it is only the trading on MNPI that makes it illegal, "where a defendant has traded on the basis of inside information, the defendant has not engaged in any 'lawful trading.'  Rather, the defendant has committed an 'offense.'  The fact that the defendant later earns profits that he would have earned if he had, in fact, traded lawfully does not change the fact that he has traded unlawfully." *Id*. at *7.  The court added: "[I]t makes no more sense to insulate the insider trading defendant from the risk that he will earn more than he expects than to insulate the bank robber who robs a bank from the risk that the vault is full." *Id*. at 7.  The court summarized succinctly:

> In sum, the Guidelines refer to the defendant's "gain resulting from the offense."  That "offense" occurs when a defendant executes or causes to be executed trades, and inside information was a factor in the defendant's decision to do so.  Accordingly, since the defendant commits the "offense" when he trades, it makes perfect sense that the

8

>Guidelines calculate the "gain resulting from the offense" as "the total increase in value realized through trading in securities by the defendant." Since the plain meaning of "increase in value" is the difference between the purchase and sale price, the government's method best accords with the plain language of the Guidelines.

*Id*. at *8.[5]

In *United States v. Martoma*, an insider trading defendant argued that his gain should be lowered because of extrinsic market factors, in his case the "market volatility in 2008." 48 F. Supp. 3d 555 (S.D.N.Y. 2014). The court disagreed, and quoted *Rajaratnam*: "Measuring the change in stock price might measure the value of what an insider knows, but that is not how the Guidelines measure the 'gain.'" *Id*. at 570. The court added, "Since the insider trading defendant stood to—and, presumably, hoped to—benefit from market forces, it is not unjust to refuse to exclude the effect of those same market forces in calculating the gain from his office." *Id*.

When the Guidelines want to exclude something from a loss or gain calculation, they say so. *See, e.g.,* § 2B1.1 Application Note 3(C) (in a section titled "Exclusion from Loss," specifying what to exclude when calculating a defendant's loss amount under § 2B1.1). There are no exclusions specified in § 2B1.4. Rather, the Guidelines instruct simply to look to "the total increase in value realized through trading in securities by the defendant[.]" *See* § 2B1.4 Background. Here, the Defendant's net proceeds—sale price minus purchase price—best measures the total increase in value he realized from unlawfully trading in Company A securities. Accordingly, using the Defendant's net proceeds most closely follows the Guidelines.

---

[5] It is also not clear that the pre-disclosure appreciation was unrelated to the strong sales underlying the MNPI. Law abiding investors could have expended significant resources to learn that Company A's earnings would beat expectations. For example, asset managers could have hired marketing consultants to gauge consumer sentiment or data scientists to analyze the prevalence of certain internet searches. If this were the cause of the share price's rise, it would be unfair to subtract this from the gain of the Defendant, who simply stole the MNPI from his employer.

9

The Defendant is correct that Courts have—rarely—looked beyond an insider trader's net proceeds to determine "gain" under the Guidelines. *See, e.g., United States v. Nacchio*, 573 F.3d 1062 (10th Cir. 2009). But those cases have one critical difference: the criminal trader did not sell the securities around the time the MNPI was publicly disclosed. *See id.* (trader sold shares in advance of disclosure of negative MNPI); *United States v. Chan*, 981 F.3d 39 (1st Cir. 2020) (trader retained ownership of shares long after disclosure of positive MNPI). And in those cases, courts have never done what the Defendant here suggests: ignore the price the Defendant paid while in possession of MNPI.

The cases generally fall into one of two fact patterns; both are inapplicable here. In the first, to avoid a loss, a defendant sells securities while in possession of negative MNPI and before that MNPI is disclosed. *Nacchio*, 573 F.3d at 1065-66 (corporate insider exercised options and sold resulting shares prior to disclosure of company's accounting errors). In such cases, courts cannot look to the defendant's net proceeds because those proceeds do not reveal the loss the trader avoided, *i.e.*, the loss he would have suffered had he held on to the securities through disclosure of the negative MNPI. *See Nacchio*, 573 F.3d at 1078, 1084; *Rajaratnam*, 2012 WL 362031 at *15 (holding that the "gain" for illegal trades motivated by loss avoidance was the "decrease in value from the time that Rajaratnam sold Intel, Google, and Goldman Sachs shares on the basis of [MNPI] to the time that the public learned the [MNPI]" multiplied by "the number of shares Rajaratnam sold").

The second fact pattern occurs when a defendant holds a security, originally purchased on the basis of MNPI, and retains ownership long after disclosure of that MNPI. *See United States v. Chan*, 981 F.3d 39 (1st Cir. 2020) (insider sold securities—originally purchased on MNPI—months after disclosure of material, non-public test results); *United States v. Mooney*, 425 F.3d 1093 (8th Cir. 2005) (insider sold call options—originally purchased on basis of MNPI—approximately four months after

disclosure of corporate acquisition). There, courts generally exclude from the "gain" calculation any change in the security's price after disclosure of the inside information. *Chan*, 981 F.3d at 63 (affirming, over defendant's objection, the district court's calculation of "gain" as the price of the security at the time of disclosure—despite the fact the defendant retained ownership—minus the defendant's purchase price); *United States v. Jing Wang*, 2015 WL 1955045 (S.D. Cal. 2015) (same); *United States v. Royer*, 549 F.3d 886, 905 (2d Cir. 2008) (affirming district court's decision to limit "gain" as to those net proceeds made within three days after disclosure of the MNPI). In such a fact pattern, however, courts sometimes still simply use net proceeds. *See Mooney*, 425 F.3d at 1101 (using as "gain" the defendant's net proceeds despite the fact he retained ownership in the securities after dissemination of MNPI).

Importantly, no court has done what the Defendant here suggests—ignore the price the Defendant paid while in possession of MNPI—and with good reason. The Defendant purchased Company A securities based on the MNPI he stole. He planned to sell those securities after the MNPI's disclosure. And he did just that. His net proceeds—that is, the sales price minus the purchase price—most accurately captures his criminal conduct. *See Rajaratnam*, 2012 WL 362031 at *7 ("[W]here a defendant has traded on the basis of inside information the defendant has not engaged in any 'lawful trading.' Rather, the defendant has committed an 'offense.' The fact that the defendant later earns profits that he would have earned if he had, in fact, traded lawfully does not change the fact that he has traded unlawfully.") The PSR's gain calculation is correct and the Court should overrule the Defendant's objection.[6]

---

[6] Separate and apart from the law, the Defendant's proffered gain calculation fails to capture the complexity of options contracts. The Defendant seeks to measure the "gain" from the sale of his Company A call options by comparing the strike price for the options and the closing stock price immediately before Company A announced its earnings. But this is not how options are priced or valued. Options are priced based on several factors including the current stock price, the option's strike price, time until expiration, volatility, and risk-free interest rates. *See* The Basics of Option Prices, *available at* https://www.investopedia.com/articles/optioninvestor/09/buying-options.asp#toc-pricing-call-options. The Defendant's proposed "gain" calculation fails to account for these factors and therefore

11

### b. The Defendant abused his position of trust by stealing MNPI from Company A, sending it to himself, and trading on it.

The Defendant owed a fiduciary duty to Company A as a trusted and high-ranking executive. He was a member of the Control Group and, along with the CEO and other key management personnel, received draft financial information prior to its public release. Most critically, the Defendant was given immediate, unsupervised, and unfettered access to Company A's enterprise resource platform containing the company's confidential financial performance, from which he stole the MNPI. The Defendant abused his position to execute his crime. The abuse-of-trust enhancement under U.S.S.G. § 3B1.3 applies.

#### i. The Eleventh Circuit has set forth a two-pronged test.

In *United States v. Louis*, the Eleventh Circuit set forth the two-prong test for application of the enhancement. 559 F.3d 1220, 1226 (11th Cir. 2009). *First*, "[f]iduciaries and employees of a public or private agency who exercise considerable discretion are subject to the enhancement. Lower-level, closely supervised employees who exercise little discretion are not." *Id*. *Second*, "[t]he enhancement also requires that the offender occupy a position of trust in relation to the victim, not another party." *Id*.

While the "determination of whether a defendant occupied a position of trust is extremely fact sensitive," *id.* at 1225, the Eleventh Circuit has repeatedly affirmed application of the enhancement when the defendant misappropriated or embezzled information obtained pursuant to his position of trust. In *United States v. Pederson*, the Eleventh Circuit affirmed applying the enhancement to a law enforcement officer who unlawfully accessed and disclosed law enforcement records. 3 F.3d 1468, 1469 (11th Cir. 1993). Rather than focus on the defendant's managerial position—or lack thereof—the Circuit Court looked to the fact the defendant misappropriated "information [] entrusted to [him] in his capacity as a sworn police officer, and he was given training and instructions regarding permissible access to and

---

fails to provide a basis to properly calculate gain on his options trades based on MNPI.

dissemination of the information in order to safeguard its confidentiality." *Id*. at 1471.  Similarly, in *United States v. Brenson*, the Eleventh Circuit affirmed application of the enhancement to a grand juror who misappropriated grand jury material.  104 F.3d 1267 (11th Cir. 1997).  There, the Circuit Court held, "[i]n applying § 3B1.3, the court should inquire as to whether or not the defendant used any special knowledge or access provided by his position of [] trust to facilitate or conceal the offense."  *Id*. at 1287.

ii. The enhancement applies to the Defendant.

The enhancement applies to the Defendant and his illegal trading.  *First*, the Defendant was a fiduciary who exercised considerable discretion as a Vice President and Controller of the company.  The Defendant had universal and immediate access to all aspects of the company's financials—a privilege that not all Company A employees had.  On his last day with the company, he was able to affirmatively access the company's confidential quarterly earnings—some of the most important and confidential material the company generated—without any oversight or detection.  Further, he was able to generate the report and email it to himself using two external email accounts without any detection.

*Second*, the Defendant occupied a position of trust in relation to Company A.  Employees owe their employers a fiduciary duty.  *See Carpenter v. United States*, 484 U.S. 19, 27 (1987) ("[A]n employee has a fiduciary obligation to protect confidential information obtained during the course of his employment.") (citation omitted).  Company A employed the Defendant, and on his last day of employment, he stole some of the company's most critical financial data.  Furthermore, because of the critical information the Defendant had access to, and the little oversight he had within the company, he was subject to the company's "black-out periods," which strictly forbid all VP and higher employees from trading in Company A securities around the release of the company's quarterly results.

*Third*, the core of the Defendant's violation of trust was his theft of MNPI, which was possible

specifically because of the Defendant's position at Company A.  Just like Officer Pederson in *United States v. Pederson*, and the grand juror in *United States v. Brenson*, the Defendant here abused trust placed in him to access and steal confidential information.  It was only with that trust was he able to access the information, and therefore commit the crime.

*Lastly,* the Guidelines state that a lawyer acting as a guardian who embezzles money is liable for the enhancement.  *See* U.S.S.G. § 3B1.3 App. Note 1.  The Defendant acted as guardian of the company's financial data.  He embezzled that information for his personal gain.  The PSR is correct—the enhancement applies, and the Defendant's objection should be overruled.[7]

### III.   3553(a) FACTORS

   a. **The nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense demand a Guidelines sentence.**

The Defendant executed a sophisticated fraud born not out of need, but want.  He stole critically important financial data from a company that had employed him for more than five years.  He placed his trades with inside information, bearing little market risk, and waited for Company A's earnings to be disclosed, when he knew the stock price would rise.  And when questioned by law enforcement about the trades, the Defendant lied.

The Defendant's insider trading undermines the public confidence in the markets, betrays the trust of investors in public companies, and is simply the conversion of a company's propriety information for personal, selfish gain.  Such cheating deters ordinary investors—who lack the advantages enjoyed by insiders—from investing in the markets.

---

[7] For purposes of considering the lack of oversight over the Defendant, and the independence with which he engaged in the company's confidential financial information, Company A did not learn that the Defendant accessed and sent himself the company's draft financial results until after the FBI imaged his work laptop.

Independent of the illegal trades he made, the Defendant received from the company millions of dollars' worth of Company A shares that appreciated significantly from the quarterly results he traded on illegally. The Defendant stood to profit handsomely had he simply done nothing. Instead, he betrayed the company and defrauded the market.

### b. General deterrence demands a Guidelines sentence.

The Eleventh Circuit recently observed: "General deterrence is more apt, not less apt, in white collar crime cases." *United States v. Howard*, 28 F.4th 180, 209 (11th Cir. 2022). The reason is that "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity," which makes them "prime candidates for general deterrence." *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) (internal citations omitted). Courts have routinely noted the propriety of significant sentences in the context of financial crimes, including specifically insider trading, committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense). As the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

The Eleventh Circuit noted: "We have encouraged our district court colleagues to keep in mind that criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in

crime." *Howard*, 28 F.4th at 210 (internation citations omitted).

With the continued rise of retail investing, and the growth of the financial sector in South Florida, a strong, incarcerative sentence is necessary to deter investors from engaging in insider trading.

### *Conclusion*

Based on the foregoing, the Court should overrule the Defendant's objections to the PSR's Guidelines analysis and impose, at sentencing, a sentence at the bottom of the resulting Guidelines range.

Respectfully submitted,

| | |
|---|---|
| HAYDEN P. O'BYRNE<br>UNITED STATES ATTORNEY | LORINDA I. LARYEA<br>ACTING CHIEF, FRAUD SECTION<br>CRIMINAL DIVISION<br>U.S. DEPARTMENT OF JUSTICE |
| /s/ Eli S. Rubin<br>Eli S. Rubin<br>Court ID No. A5503535<br>Elizabeth Young<br>Assistant United States Attorneys<br>99 N.E. 4th Street<br>Miami, Florida 33132<br>(305) 961-9247<br>Email: Eli.Rubin@usdoj.gov | /s/ Matthew F. Sullivan<br>Matthew F. Sullivan<br>Trial Attorney<br>Court ID No. A5502369<br>1400 New York Avenue, N.W.<br>Washington, DC 20530<br>(202) 578-6583<br>Email: Matthew.Sullivan2@usdoj.gov |

## **CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF on April 21, 2025.

             *s/ Eli S. Rubin*
             Eli S. Rubin
             Assistant U.S. Attorney