UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 25-CR-60011-DIMITROULEAS

UNITED STATES OF AMERICA,

vs.

STEPHEN GEORGE,

                         Defendant.

_____/

**STEPHEN GEORGE'S SENTENCING MEMORANDUM AND MOTION FOR A
DOWNWARD DEPARTURE/VARIANCE**

Stephen George respectfully submits this memorandum and accompanying exhibits—including letters of support from family, friends, and former colleagues—to assist the Court in determining the appropriate sentence to impose. Mr. George further respectfully submits that a sentence of home confinement, in addition to time served, is reasonable and sufficient, but no greater than necessary, to comply with the purposes of sentencing, that is, to promote respect for the law, adequately punish the crime, and deter others, as required by 18 U.S.C. §3553(a).

## <u>INTRODUCTION</u>

Mr. George is a 54-year-old husband and father of two sons. He lives in Parkland, Florida, where he has been raising his family since 2009. On February 4, 2025, Mr. George pled guilty to one count of securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b-5. Deeply regretful for his conduct, Mr. George acknowledges that he engaged in serious criminal conduct and takes full responsibility for the actions that brought him before this Court to be sentenced. As the dozens of support letters submitted to the Court show (*See* Exhibit A), Mr. George is honorable, hard-working, deeply committed to his faith, and has led a decent life as a loving and devoted husband, father, son, and brother. Indeed, the conduct that led to Mr. George's guilty plea is completely inconsistent with his otherwise law-abiding character and family-oriented life.

It is precisely his character that compelled Mr. George to take extraordinary measures to accept full responsibility for his conduct. Mr. George waived indictment, appeared before the Court to plead guilty less than two weeks after being charged, consented to the preliminary order of forfeiture in the amount of $1,682,801.66, and paid the forfeiture money judgment in full within days of entry of the preliminary order of forfeiture – all of which saved the government significant time and resources. Before sentencing, Mr. George will pay an additional $203,563.80 to Company A in restitution although there is no controlling precedent that includes attorneys' fees as reimbursable expenses under the Mandatory Victims Restitution Act ("MVRA"). Rather than litigate Company A's entitlement to restitution, Mr. George chose to pay this considerable sum, in addition to the forfeiture, as part of his acceptance of responsibility. Indeed, since he signed the plea agreement, Mr. George has done everything within his power to make amends for his conduct.

Remarkably, Mr. George entered into the plea agreement only twenty days after suffering the type of heart attack commonly known as a "widow maker." While recovering from the heart attack and cardiac catheterization, Mr. George met with his lawyers for hours at a time and engaged

1

with the government, undertaking the extremely stressful task of negotiating the plea agreement that resulted in his guilty plea. As his doctor attests, stress is extremely dangerous for his medical conditions and can have life-threatening consequences for his health.

Because of his health, if Mr. George receives a sentence of incarceration, he will very likely be designated as a Medical Care Level 3. Such a designation would make Mr. George ineligible for a camp and would require incarceration in a more secure facility than is otherwise required for first-time non-violent offenders which, as explained by Joel Sickler, an expert on federal prisons, could have a devastating effect on Mr. George's health and medical care. Considering his acceptance of responsibility, his life-threatening health conditions, the impact that incarceration will have on his health, the letters submitted on Mr. George's behalf by friends and family, the punishment that Mr. George and his family have already suffered, and the virtual certainty that Mr. George will not reoffend, Mr. George respectfully asks the Court to impose a sentence home confinement, in addition to time served.

## MR. GEORGE'S HISTORY AND CHARACTERISTICS

Mr. George was born on May 26, 1970, in Kerala, India, to George K.C. and Lilly Kutty. Mr. George's parents raised him and his brother, George P. Jacob, in Kerala, a small village in the southwest corner of India. Mr. George's father worked for the government of Kerala, and his salary was insufficient to cover the family's basic needs. At times, Mr. George and his brother went to bed hungry, and whenever he could, Mr. George's father would give up food so that his children could eat. When Mr. George was seven years old, his family converted to the Pentecostal religion. Their conversion was not accepted in their community, and the family became isolated. Mr. George recalls people throwing stones at their house during prayer meetings, but he was not deterred from his faith. On the contrary, Mr. George has remained very active in the church throughout his life, serving as a youth minister, dedicating considerable time and financial resources to helping others, and raising his sons in his faith.

Mr. George has always maintained a close relationship with his family. He speaks with his parents each day by video call between Mr. George's home in Florida, and his parents' home in Kerala. Indeed, Mr. George's brother described how his parents "look forward to" Mr. George's calls and "wait eagerly by the phone" for Mr. George to call them every day. *See* Ex. A, Ltr. Pastor George P Jacob. In addition to his daily calls, since his father had a stroke in 2012, Mr. George and his family have saved their vacation time to visit India and care for Mr. George's parents for

2

three weeks every June. Mr. George also supports his parents financially, providing for all their needs, including housing, food, and medical care. Their medical care is particularly important, as Mr. George's father is 91 years old, and Mr. George's mother is 82 years old. Mr. George's father needs extensive care and cannot travel long distances. He has undergone two surgical interventions to treat cancer and has had three strokes which reduced his mobility and caused difficulties with his speech. He is also diagnosed with chronic kidney disease, high blood pressure, high cholesterol, and high triglycerides. (Exhibit J, Medical Certificate for Mr. K.C. George.) He recently started taking prescription medication for anxiety, for the first time in his life, because he fears not seeing his son again.

In addition to being a loving son and brother, Mr. George is a devoted father and husband. He married Sissy Stephen in 1997. In 28 years of marriage, Mr. George and Mrs. Stephen have been apart, in total, for no more than fourteen days. Mrs. Stephen is a registered nurse and the head of the neonatal intensive care unit at a local hospital. The couple raised two sons, Geoffrey Stephen and Turley Stephen. Geoffrey is 24 years old and is in medical school. He lives with Mr. George and Mrs. Stephen because he has severe food allergies that require constant monitoring and support. Turley is 17 years old and is finishing his last year of high school. Both sons have been severely affected by the investigation and guilty plea. For Turley, the effects have been both emotional and physical. He began suffering from anorexia, lost 25 pounds over the last year, and is only beginning to gain some weight with medical intervention.

Throughout her career, Mrs. Stephen has worked demanding hours. As a neonatal nurse, she is often called to work in the middle of the night and works long unpredictable shifts. Consequently, Mr. George took the primary childcare role at home over the years, while also working full time. As Mrs. Stephen said in her letter of support:

> We had no family support to help us care for our children, but Stephen embraced every bit of that responsibility with love and dedication. He was deeply committed to our children's growth and education. After a long day at work, he would come home, sit with them, and help with their homework. He prioritized raising thoughtful, responsible children who would one day give back to the community.

To this day, Mr. George has significant household responsibilities, monitors Geoffrey's medication, takes Turley to and from school, and cares for his wife's mother, who requires assistance with activities of daily living. Mr. George also supports his wife by taking her to and from work and making sure that she has meals throughout her working hours. Mr. George's older

son describes in his letter how devoted Mr. George is as a husband:

> The following mornings, no matter how late we slept[,] my dad would still be up by 6:00 A.M. to pick up my mom from work. He would be the first person there at the hospital, and he would wait no matter how long he needs to, so that she can come home and rest as early as possible. Since his last day at work, he makes the effort every day to drop her off and pick her up since she has had trouble driving since she tore her rotator cuff. My dad will always show up 30 minutes early and wait outside my mom's work patiently so she can come home and relax as soon as she can.

*See* Ex. A, Ltr. Geoffrey Stephen.

Unfortunately, Mrs. Stephen is also suffering from complex medical problems. She was recently diagnosed with ventricular hypertrophy, pulmonic valve insufficiency, tricuspid regurgitation, myocardial ischemia, and angina pectoris. Ventricular hypertrophy is a thickening of the heart muscle that is responsible for pumping blood to the body. The condition can cause shortness of breath, fatigue or dizziness, chest pain, palpitations, and heart failure. To treat certain conditions, she may require open heart surgery. As she stated in her letter of support, however, Mrs. Stephen has not scheduled any procedures because she does not feel like she can go through with the procedure or the recovery without Mr. George by her side, as he is her "emotional support and the primary caregiver in [their] home."

### Mr. George's Health

Mr. George had a heart attack four months ago, on December 21, 2024, and suffers from life-threatening conditions. As detailed in the letter from his treating cardiologist, Dr. Mohamed Osman, Mr. George was admitted to Coral Springs Medical Center on the night of December 21, 2024, due to intense chest pain, cold sweats, and significant hypertension. An angiogram revealed three significant coronary artery blockages: a 99% proximal stenosis in the Left Anterior Descending (LAD) artery (commonly referred to as the "Widowmaker"), 80% narrowing in a high diagonal artery, and 50-60% blockage in the proximal to mid Right Coronary Artery (RCA). (Exhibit B, Dr. Osman Letter.)

This situation necessitated an urgent referral for cardiac catheterization, which was performed the following day, December 22, 2024. Due to also having concurrent acute kidney injury, only the critical lesion in the LAD was treated during the procedure, with the placement of a stent. The remaining blockages are currently being treated medically. It is fortunate that Mr. George survived the acute event and received timely intervention in his LAD. His treatment regimen includes dual antiplatelet therapy, management of blood pressure and lipids, and frequent

4

monitoring of renal function. In addition to his heart attack and acute kidney injury, Mr. George also has hypertension, hyperlipidemia, and elevated triglyceride levels. (*Id.*)

As his Dr. Osman explains, a term of incarceration would pose a high risk to Mr. George's cardiac health. Dr. Osman advised that Mr. George should avoid physical and emotional stress, as such factors aggravate Mr. George's underlying cardiac condition. He further explained that any form of undue stress could be harmful and potentially life-threatening and respectfully asked the court to consider home confinement as a sentencing alternative, which would allow Mr. George to continue receiving uninterrupted medical treatment, adhere to his strict medication and dietary regimen, and avoid the physical and emotional stressors that could precipitate another potentially life-threatening cardiac event. (*Id.*)

Mr. George requires ongoing treatment, medical supervision, and significant lifestyle modifications, including medication management,[1] diagnostic testing (such as ECGs, echocardiograms, and blood pressure monitoring), and adjustments to his treatment plan as necessary. Due to the nature of his condition, Mr. George must adhere to a strict cardiac healthy diet that is low in sodium, saturated fats, and cholesterol, while being rich in fruits, vegetables, and whole grains. Any deviation from this dietary regimen could worsen his cardiac condition. (*See id.*) Mr. George is also diagnosed with non-alcoholic hepatic steatosis (fatty liver disease) and is under medical evaluation for a muscle growth in his back that is causing pain and limiting his mobility.

### *Mr. George's Moral Character*

Family members, friends, and former colleagues who have known Mr. George at different stages of life have taken considerable time out of their busy lives to prepare detailed letters to the Court attesting to his deep and abiding commitment to family and community and to his profound and enduring faith. The support letters attached as Exhibit A help paint a full picture of Mr. George—a family man, a man of faith, and a beloved person who is defined by much more than his regretful aberrant conduct.

In the words of his younger son, Turley, "my father gave his all to us. He became every role—chef, chauffeur, counselor, homework helper." Turley explained that while his mother has been on-call 24/7 throughout his life, he never felt the absence of a parent because Mr. George was

---

[1] In addition to the medications listed in the PSR, Mr. George is now also taking Pantoprazole (a medication for reflux disease) and Tamsulosin (an alpha blocker).

always there for him. Throughout his life, Turley saw his father "put others before himself without hesitation." And as Turley so pointedly said, his father is "not perfect—but he's good. Deeply, unwaveringly good… the kind of man whose goodness changes the room." Mr. George's older son, Geoffrey, has similar memories. He recalls the comfort of late nights in his father's care, while his mother was working night shifts at the hospital. He strives to be like his father, a man who "consistently and constantly puts the wellbeing of others ahead of his own." It is for this reason that Geoffrey relies on his father to get him through the numerous life-threatening emergencies he has suffered because of his severe food allergies. Geoffrey knows, without a doubt, that his EpiPens will be stocked and where they need to be, and that his father will be the first face he sees when he awakens from what have proven to be inevitable and unpredictable allergic reactions.

Mr. George has also been a pillar of his community. He started a cricket team and quickly became not only a coach, but a mentor to dozens of children and young adults. As the kids who have benefited from his mentorship have said, Mr. George brought together "a community and a family of kids who could support each other no matter what life would throw at them." (Exhibit A.) They described playing cricket with Mr. George as "a warm ray of sunshine on a cold day" and said he shows "compassion and love for those [in] the community." (*Id*.) And when describing how Mr. George helped a friend's grandfather when he was severely ill, the friend said, "I have seen dads show up for their kids, and dads who have shown up for their family, but for the first time in my life, some[one] else's dad, Stephen George, showed up for my family." (*Id*.) Reaching beyond his community in South Florida, Mr. George has offered assistance in any way he can, including financial assistance to friends and family in need, donations to the March of Dimes, clothes collections for homeless individuals, volunteer work for hurricane victims in the Bahamas, church tithing, and the sponsorship of two children in other countries (one in South Africa and one in South America), where resources are insufficient for the children to grow up in safe and healthy environments without the additional support of loving people like Mr. George.

Mrs. Stephen recalls several times in which Mr. George chose compassion and understanding over anger and greed. As one example, they were on their way to Toys "R" Us with their two young sons in the car. They were t-boned at an intersection by a 17-year-old young woman who had been texting and did not see the red light. While in physical pain and shock from the accident, Mr. George said about the young woman "yes, she made a mistake, but think about her parents too, how hard this must be for them." (*Id*.) On another occasion, a doctor gave their

6

son Turley medication that Mr. George and Mrs. Stephen had advised would cause an allergic reaction. Turley did in fact develop a terrifying and distressing reaction and had to be rushed to the emergency room. Once he was stable, Mr. George's response, once again, was to forgive the doctor and encourage the other members of his family to forgive as well, reminding them "that people make mistakes and that holding onto anger wouldn't bring healing." (*Id.*)

With impressive consistency, Mr. George's family, friends, and former colleagues describe him as compassionate, empathetic, loyal, kind, generous, loving, and a person who is a "unifier" and "builds a sense of belonging" for others.

<u>SENTENCING CONSIDERATIONS</u>

### I.     Legal standard

Although the Court must consider the United States Sentencing Guidelines (the "Guidelines"), they are no longer mandatory and are not presumed to be reasonable; they are just one of many factors to be weighed when selecting a disposition that is sufficient but not greater than necessary to satisfy the purposes and goals set forth in § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Indeed, the advisory Guideline range does not have "any particular weight." *United States v. Martin,* No. 23-12139, 2025 WL 88687, at *6 (11th Cir. Jan. 14, 2025). The Court must conduct its own evaluation of the § 3553(a) factors and may "reject (after due consideration) the advice of the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 113 (2007).

### II.    A sentence of home confinement is sufficient to achieve the objectives of sentencing.

Considering all the §3553(a) factors, Mr. George respectfully submits that a sentence of home confinement, in addition to time served, is sufficient to achieve the objectives of sentencing.[2] *Kimbrough*, 552 U.S. at 101. Mr. George urges the Court to consider: the aberrant nature of the instant offense; his relatively advanced age; his law-abiding and family-oriented life, apart from the instant offense; his decision to waive indictment, accepting full responsibility for his offense; his immediate payment of the full forfeiture amount requested by the government; his agreement to pay the full restitution amount requested by Company A; the damage already caused to his reputation and his family; his life-threatening health issues; the significant support Mr. George provides to his family; and the serious health issues that his wife is facing.

---

[2] A non-custodial sentence is "not granted out of a spirit of leniency" and "is not merely letting an offender off easily." *See Gall*, 552 U.S. at 48.

### III.  <u>Mr. George's personal history and characteristics</u>

Mr. George's personal history and characteristics — including lack of criminal history, life-threatening medical conditions, advanced age, and caretaking responsibilities — compel a downward departure and/or variance to a sentence of home confinement. *See United States v. Powell*, 576 F.3d 482, 499 (7th Cir. 2009) (remanding case for a new sentencing hearing considering these factors). *See also*:

- *U.S. v. Carlicha* Starks, 19-cr-80202 (S.D. Fla. 2021 (Judge Dimitrouleas)) (This Court granted a variance to time served and supervised release for three years, with first 12 months of home confinement where defendant had no criminal record, suffered from serious medical conditions which would be difficult to monitor and manage in prison, and was caring for vulnerable family members)

- *U.S. v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (per curiam) (affirming a sentence of three years' probation, including six months home confinement, for an insider trading conviction based on guilty plea, prompt payment of restitution, age over 50, damage to reputation, and loss of a high-paying job)

- *U.S. v. Testerman*, 446 F. Supp. 2d 640 (W.D. Va. 2006) (finding a below guideline sentence of probation and home detention was justified in part based on the defendant's advanced age, previous law-abiding life, and sufficient collateral punishment)

- *U.S. v. Spedden*, 917 F. Supp. 404 (E.D. Va. 1996) (sentencing defendant to home confinement because of the cumulative nature of the medical hardships facing the Defendant and his family)

Moreover, data published by the U.S. Sentencing Commission and cases throughout the country demonstrate that courts routinely grant substantial variances to defendants convicted of insider trading, including variances that result in non-incarceratory sentences. *See e.g.,*:

- *U.S. v. Mendes*, 22-cr-359 (N.D. Cal.) (sentenced to probation for a term of four years for insider trading).

- *U.S. v. Bonthu*, (N.D. Ga. 2018) (sentenced to eight months of home confinement for insider trading)[3]

- *U.S. v. Spera*, 17-cr-526- MAS (D.N.J.) (sentenced to probation for a term of one year for insider trading)

- *U.S. v. Petrello*, 16-cr-069-MAS (D.N.J.) (sentenced to probation for a term of three years,

---

[3] See press release, available at: https://www.justice.gov/usao-ndga/pr/former-equifax-manager-sentenced-insider-trading.

with first 12 months on home detention with location monitoring, for insider trading)

- *U.S. v. Parigian*, 14-cr-10201 (D. Mass. 2015) (sentenced to time served and 36 months supervised release, including 8 months of home detention, for insider trading)

These cases are not anomalies. As set out in Exhibit C, between 2002 and 2023, approximately 29% of individuals who pled guilty, had a criminal history category of I, scored between offense level 17 and offense level 21, and did not receive a USSG §5K1.1 substantial assistance downward departure, received a non-incarceratory sentence. Many of these cases involve securities fraud, including insider trading.[4] The reasons for departure and/or variance in these cases include aberrant behavior (USSG §5K2.20), age (USSG §5H1.1), physical condition (USSG §5H1.4), need for medical care (18 USC §3553(a)(2)(D)), family ties and responsibilities (USSG §5H1.6), community ties/charitable service/good works (USSG §5H1.6), history and characteristics of the defendant, acceptance of responsibility, early plea, non-violent offender, and remorse. (*See* Exhibit C at 1.)  Mr. George similarly meets the requirements for departure and/or variance that was present in each of these cases. For example, Mr. George's offense conduct here represents a "marked deviation … from an otherwise law-abiding life" (USSG § 5K2.20). The other factors are further addressed below.

### IV.    A non-custodial sentence would provide medical care in the most effective manner (§ 3553(a)(2)(D))

The Court should consider Mr. George's "physical impairments and advanced age when determining the sentence it believes appropriate under 18 U.S.C. § 3553(a)." *United States v. Powell*, 576 F.3d 482, 499 (7th Cir. 2009) (remanding case for a new sentencing hearing considering these factors); *United States v. Truesdale*, 286 F. App'x 9 (4th Cir. 2008) (imposing a below guideline sentence based on defendant's health.); *United States v. Testerman*, 446 F. Supp. 2d 640 (W.D. Va. 2006) (finding a below guideline sentence of probation and home detention was justified in part based on the defendant's advanced age and previous law-abiding life). A non-custodial sentence would be the most effective way of providing necessary medical care to Mr. George given his advanced age and health conditions. As Dr. Osman states in his letter to the Court, Mr. George's ongoing health issues would subject to him to substantial medical risk if he were to be incarcerated. (Exhibit B.) As set out in detail below, Dr. Osman's concern is well

---

[4] Additionally, many cases involving the misuse of insider information are addressed administratively or civilly, without criminal charges.

founded.

      Joel Sickler is an expert on federal sentencing and federal prison-related matters, with more than 40 years of experience. He has visited 52 federal prisons and has extensive knowledge of the Bureau of Prison's ("BOP") mission, services, policies, program statements, regulations, and standard practices. Mr. Sickler has provided the attached declaration (Exhibit D.) to demonstrate the impact Mr. George's health will have in determining the type of facility he would be housed in and whether Mr. George's medical conditions could be treated in the most effective manner.

      Mr. Sickler explains that, while Mr. George would normally be eligible to serve a custodial sentence at a minimum-security Federal Prison Camp ("FPC"), his serious health conditions will result in the BOP designating him to a Medical Care Level 3 facility.  (Ex. D ¶¶ 11-14.) If so, Mr. George will be ineligible to serve a sentence at a minimum security FPC facility. Instead, he will likely be designated to the Federal Correctional Complex in Butner, NC, where he would be housed in a low security Federal Correctional Institution ("FCI") because no minimum-security facility is available there. (*Id*. ¶ 14.)

      Mr. Sickler spells out the significant differences between a minimum security FPC and low security FCI facility, namely: (1) FPCs are fenceless compounds with low security protocols, whereas FCIs have secured perimeters and greater restrictions on movement within the facility; (2) FCIs are five to ten times larger than camps, resulting in overcrowding and inconsistent availability of healthy foods, including fruits and vegetables; and (3) FPCs typically receive non-violent first offenders, while FCIs can house repeat violent offenders and those who have misbehaved at lower security facilities. (*Id.* ¶¶11-14*.*

      Mr. Sickler further explains that Mr. George would receive less adequate medical care than he currently receives and requires. (*Id.* ¶¶ 33.) As, an example, in April 2024, the DOJ OIG conducted an unannounced, on-site inspection of FMC Devens and "identified several serious issues at FMC Devens related to staffing, inmate healthcare quality, infrastructure, inmate programming, failure to complete rounds, and radio system deficiencies," and noted "substantial shortages of healthcare employees and Correctional Officers—which is an issue at many BOP institutions but particularly problematic for a medical institution." (*Id.* ¶ 23.) Specifically, FMC Devens "had only 1 physician and the Clinical Director (who is also a physician) to manage the care of the entire inmate population of approximately 941 inmates." (*Id.* ¶ 24.) According to the DOJ OIG report, this "created widespread and troubling operational challenges at FMC Devens

that substantially affect **the health, welfare, and safety** of employees and inmates." (*Id.* ¶ 23.) Mr. Sickler explains that these conditions are not limited to FMC Devens and permeate BOP Institutions. (*Id.* ¶ 26.)

In sum, if Mr. George is sentenced to a term of incarceration, he very likely will be assigned to a prison facility beyond his security needs, due solely to his medical conditions. Moreover, any facility will be well below the standard of medical care he currently receives and needs. On the other hand, a non-custodial sentence would satisfy the need for the sentence imposed to provide needed medical care in the most effective manner because it will enable Mr. George's rapid access to the medical specialists who have been continuously treating him.[5]

## V.      Mr. George's extraordinary acceptance of responsibility

In addition to pleading guilty (within such a short time after a life-threatening heart attack), Mr. George immediately paid the full forfeiture amount requested by the government and agreed to pay the full restitution amount requested by Company A, despite having a good faith legal defense to the request for restitution. These payments exemplify Mr. George's extraordinary acceptance of responsibility. *See United States v. Kim*, 364 F.3d 1235 (11th Cir. 2004) (payment of $280,000 in restitution in a fraud case was extraordinary enough to remove the case from the "heartland" and justify a downward departure to probation and home detention);[6] *see also United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (granting variance to probation in part because defendant paid restitution in full before sentencing, had accepted responsibility and posed little risk of recidivism).

## VI.      Home confinement and collateral consequences are "just punishment" for Mr. George (§ 3553(a)(2)(A))

Courts recognize that punishment comes in many forms and that overly harsh punishments are counterproductive. *Gall*, 552 U.S. at 54. Moreover, courts may consider collateral consequences as part of the punishment that a defendant endures. *See, e.g., United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) (granting downward variance in part because defendant suffered

---

[5] For the same reasons, Mr. George meets the conditions for downward departure consideration under USSG §§ 5H1.1 (age) and 5H1.4 (physical condition).

[6] In *Kim*, a pre-*Booker* case, the Eleventh Circuit found that granting a departure on this basis was not a prohibited factor but only a discouraged factor under the Guidelines, requiring exceptional circumstances. Under *Gall* a lesser showing also justifies a variance.

numerous collateral consequences, including loss of teaching certificate and state pension); *Stewart*, 590 F.3d 93 at 141 (affirming variance where conviction likely barred defendant from future work in his chosen profession); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (affirming downward variance based, in part, on "other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and his company…").

Mr. George and his family have already suffered significant collateral consequences from his actions, including financial sanctions, loss of reputation and standing in the community, and the recognition that his mistakes and failings have created trauma and hardship for his wife, children, siblings, and parents. Mr. George's guilty plea was covered in several local papers. His reputation is ruined, and it will be extremely difficult for Mr. George to find significant employment in his field. Moreover, numerous banks have closed Mr. George's accounts, including credit cards and brokerage accounts.

In her letter to the Court, Mr. George's wife shares the devastation that Mr. George and his family have suffered. In her words:

> Both of our children were devastated as they watched their father slowly deteriorate before their yes. It was heartbreaking to see the impact it had on them. Our younger son, in particular, began showing signs of emotional distress, and he developed anorexia and started losing weight rapidly.

Mr. George's younger son, Turley, also described the toll on his family:

> Each day that passes feels like a ticking clock echoing through our home, a reminder that time is running out, and we don't know how to stop it. We're not counting down to something joyful—we're counting down to the possibility of losing the person who holds us all together. And it's breaking us, slowly and silently. My mother, who works full-time as an on-call medical professional, is struggling in ways I've never seen her before. She's constantly being pulled in every direction—caring for strangers with everything she has, then coming home only to carry a weight she can't put into words…. She barely sleeps, eats only when she remembers, and when I pass her room at night, I hear her crying through the exhaustion…. [W]e're not okay. We're scared. We're tired. And most of all, we're desperate to keep the heart of our family with us.

Given the circumstances present here and the impact that this case has already had on Mr. George and his family, a sentence below the Guidelines range would provide just punishment. *See, e.g., United States v. Cabell*, 890 F. Supp. 13 (D.C. Cir. 1995) ("The rationale for such departure [is] not that the Defendant's family circumstances decrease his culpability, but that the Court is

reluctant to wreak further destruction on the Defendant's family.")

VII.  **Mr. George's caretaking is irreplaceable**

Departure based on the loss of caretaking or financial support may be warranted where "no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family." Application Note 5H1.6(1)(B). The departure is not on behalf of the defendant himself, but on behalf of the family. *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992). Mr. George's wife, Mrs. Stephen, is also in poor health. Moreover, because of her work responsibilities she relies on her husband to help with household tasks, including preparing meals for their sons and her mother, taking their son Turley to and from school, and providing daily care for her mother.  Any amount of incarceration Mr. George might face will devastate his wife emotionally and deprive her of his support at a time when she is facing her own cardiac issues, which may require open heart surgery. Mr. George also provides irreplaceable financial support for his parents who live in India. Under these circumstances, a non-custodial sentence is further justified. *See, e.g., United States v. Deutsch*, 104 F. App'x 202, 204 (2d Cir. 2004) (finding downward departure was justified where none of defendant's relatives was capable of caring for his family for any extended period of time).

VIII.  **Home confinement is sufficient to protect the community, promote respect for the law, and deter Mr. George from committing similar crimes (§ 3553(a)(2)(B and C))**

When imposing a sentence, the Court must consider general and specific deterrence to criminal conduct. *See* 18 U.S.C. §3553(a)(2)(B). Based on his lack of criminal history alone, Mr. George poses the lowest possible risk of recidivism. *See, e.g., Johnson*, 245 F. Supp. 3d 393 at 397 (holding that as a first time offender, "it is highly unlikely that he will again violate the laws of the United States" and sentencing the defendant to time-served; *United States v. Williams*, 662 F. App'x 366, 377 (6th Cir. 2016) (affirming a below-Guidelines sentence because the sentencing court "was motivated primarily by [the defendant's] lack of criminal history and her low risk of recidivism"). In addition, offenders like Mr. George who are over the age of 40 "exhibit markedly lower rates of recidivism in comparison to younger defendants." *United States v. Hernandez*, No. 3-cr-1257, 2005 WL 1242344 at *2 (S.D.N.Y. 2005). Here, the risk of recidivism is unquestionably low. Moreover, a sentence of home confinement, in addition to the collateral consequences that Mr. George has already suffered, meets the purposes of general deterrence.

IX.    **The kinds of sentences available (§ 3553(a)(3))**

Under 18 U.S.C. § 3553(a)(3), the Court should consider all possible sentences in fashioning a punishment that would be appropriate under the circumstances, recognizing that the Guidelines are not presumed to be reasonable. Mr. George's conviction does not carry a mandatory minimum sentence, and the Court has any number of options available to it, including a sentence of home confinement, so long as the sentence is imposed upon consideration of the 18 U.S.C. § 3553(a) factors. As recognized by the Guidelines themselves, a court may impose a term of supervised release with or without conditions if, after considering the factors set forth in 18 U.S.C. § 3553(a), the court determines that the circumstances warrant a reduction. In doing so, the court may assess, among other factors, the defendant's family circumstances and whether the defendant is a danger to the safety of others. USSG Ch.5, Pt. B, §1B1.13 (Reduction in Term of Imprisonment). The Guidelines further recognize that home detention may be imposed as a condition of supervised release, but only as a substitute for imprisonment. USSG Ch.5, Pt. F, §5F1.2 (Home Detention). Here, a sentence of home detention would adequately satisfy the purposes of sentencing after due consideration of the relevant 18 U.S.C. § 3553(a) factors.

X.    **The Sentencing Guidelines**

While Mr. George fully accepts responsibility for his conduct, he respectfully submits that his Guidelines range is disproportionate to his offense and greater than necessary to comply with the purposes of sentencing. The Sentencing Commission itself recognized that there "may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." § 2B1.1, Application Note 21(C). Mr. George respectfully submits that this is such a case where downward departure and/or variance is warranted because the guidelines offense level substantially overstates the seriousness of his offense.

In *U.S. v. Adelson*, the Court reasoned that the Sentencing Guidelines placed an "inordinate emphasis" on "putatively measurable quantities" such as the amount of actual or intended financial loss in fraud cases "because of their arithmetic approach and also in an effort to appear 'objective,' . . . without, however, explaining why it is appropriate to accord such huge weight to such factors." *Adelson*, 441 F. Supp. 2d 506 at 509. The Court further emphasized that "[b]y making the Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many

factors into account, *see* U.S.C. §3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *Id.*

In *United States v. Algahaim*, the court addressed this sentencing disparity where the defendant's base offense level calculation was increased roughly two-and-a half because of the loss amount, remarking on the "unusualness" of letting the loss amount "become the principal determinant of the adjusted offense level and hence the corresponding sentencing range." 842 F.3d 796, 800 (2d Cir. 2016). The court further advised that "[t]his approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider." *Id.* As the court concluded "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Algahaim*, 842 F.3d at 800.

These issues with the sentencing guidelines are compounded for corporate frauds because certain enhancements, such as abuse of trust, essentially double-punish corporate fraud defendants who are already facing exponential increases in offense levels due to loss amounts. The Sentencing Commission acknowledged this type of "factor creep," observing that "as more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness."[7] In Mr. George's case, the base level offense under the Guidelines is 8 points, but the upward adjustment for financial loss/gain is double at 16 points (14 if the Court agrees with Mr. George's loss/gain calculations) and potentially an additional 2 points for abuse of trust. Mr. George respectfully submits that, for these reasons, the applicable guideline range overstates the gravity of his offense.

**XI.    The appropriate increase for financial gain/loss is 14 levels.**

Mr. George objected to paragraph 35 of the PSR because the financial loss/gain resulting from the instant offense is $1,152,614.34. As the loss/gain resulting from the offense is more than $550,000 and less than $1,500,000, the offense level should be increased by 14, § 2B1.4(b)(1)(I)

---

[7] U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of how well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 137 (Nov. 2004), available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf

& § 2B1.1(b)(1). The PSR calculates the financial loss/gain resulting from the instant offense as $1,682,801.66, with a corresponding offense level increase of 16. This amount results from totaling the profits that Mr. George earned from selling call option contracts and shares that he purchased between April 10, 2023, and April 20, 2023. Mr. George respectfully submits that this calculation is erroneous because calculation of financial loss/gain resulting from the instant offense should consider solely the effect of the offense conduct (realizing a loss/gain based on possession of material nonpublic information) and exclude the effect of general market conditions and other external market forces on the publicly traded stock price. *See United States v. Nacchio*, 573 F.3d 1062, 1072–73 (10th Cir. 2009) (the guidelines do not look simply to "gain" but to "gain resulting from the offense"); *United States v. Rutkoske*, 506 F.3d 170, 179-180 (2d Cir. 2007) (explaining that the court must determine "the extent to which a defendant's fraud, as distinguished from market or other forces, caused shareholders' losses").

Stock Sale

The MNPI that is the basis of the offense was revealed to the public after the close of trading on May 9, 2023. At the close of trading on May 9, 2023, the CELH stock price was $107.13 (adjusted for the 3:1 split). Mr. George sold the stock after the public announcement for $131.85 per share (adjusted for 3:1 split). The difference between $131.85, which considers the market announcement, and $107.13, which does not, is the proper amount of loss/gain. Since Mr. George sold 20,000 shares, the loss/gain resulting from the instant offense is $494,384.18.

Options Sales

Similarly, for the options that Mr. George traded, the strike prices for each of the trades were $100, $105 and $95 (see spreadsheet below).[8] Comparing the profit Mr. George realized when he sold the options on May 10 (when the stock was trading at $131.85) to the stock price immediately before the public announcement ($107.13), the total amount of gain is $658,230.16. This calculation isolates the financial loss/gain resulting from trading on MNPI and excludes the effect of general market conditions and other external market forces on the publicly traded stock price.

| Options | | | | |
|---|---|---|---|---|
| 4/20/2023 | E Trade | CELH May 19 '23 | 100.00 | $ (25,050.98) |
| 5/10/2023 | E Trade | CELH May 19 '23 | (100.00) | $ 299,946.38 |
| 4/13/2023 | Merrill | CELH#E1923D950000 | 100.00 | $ (40,065.00) |
| 4/13/2023 | Merrill | CELH#E1923C105000 | 100.00 | $ (17,565.00) |

---

[8] 1 option is for 100 shares.

| 5/10/2023 | Merrill | CELH#E1923D950000 | (100.00) | $ 374,932.00 |
| 5/10/2023 | Merrill | CELH#E1923C105000 | (100.00) | $ 279,932.76 |

| | |
|---|---|
| Stock price at close of trading before market announcement | $ 107.13 |
| Stock price after the market announcement / time of sale | $ 131.85 |
| Shares sold | 20,000 |
| **Loss / gain related to shares sold** | **$ 494,384.18** |
| | |
| Strike price (E Trade) | $ 100 |
| Option shares sold (E Trade) | 10,000 |
| **Loss / gain related to options sold (E Trade)** | **$ 203,595.40** |
| | |
| Strike price (Merrill) | $105 |
| Option shares sold (Merrill) | 10,000 |
| **Loss / gain related to options sold (Merrill)** | **$ 218,567.76** |
| | |
| Strike price (Merrill) | $ 95 |
| Option shares sold (Merrill) | 10,000 |
| **Loss / gain related to options sold (Merrill)** | **$ 236,067.00** |
| Total Loss/Gain | **$ 1,152,614.34** |

## XII.   The Court should reject the two-level increase for abuse of trust.

"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Individuals holding such positions are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. As an example, the enhancement would apply to a bank executive's fraudulent loan scheme, but not to embezzlement by an ordinary bank teller (*see* U.S.S.G. § 3B1.3 cmt. n. 1), although both are entrusted with the bank's money. The Court "must be careful not to be 'overly broad' in imposing the enhancement for abuse of a position of trust or 'the sentence of virtually every defendant who occupied a position of trust with anyone, victim or otherwise' would receive a section 3B1.1 enhancement." *United States v. Williams*, 527 F.3d 1235, 1250 (11th Cir. 2008).

Mr. George was effectively Controller from November 27, 2017, until August 2022. During that time, several finance professionals reported to Mr. George, including the manager for accounts receivable, the financial planning and analysis manager (who was responsible for

budgeting, forecasting, and sales reports), and the manager for accounts payable. (*See* Exhibit E.)[9]
By August 2022, however, Mr. George had been effectively demoted to lead inventory
management.

Shaneika Mohammed, Mr. George's former colleague, explained in her letter to the Court
that Company A underwent significant restructuring in 2022. (*See* Exhibit F.) Many senior
employees were terminated, and new leadership hired a completely new team of licensed CPAs.
During this time, Mr. George was reassigned to the Inventory Management department, and Ms.
Mohammed transitioned from Accounts Payable Manager to Inventory Manager. An
organizational chart dated March 1, 2023, provided by the government and apparently produced
by Company A ("March 2023 Chart") (*See* Exhibit G),[10] shows only Ms. Mohammed reporting to
Mr. George. According to the March 2023 Chart, no other members of the inventory team reported
to Mr. George. Instead, the entire "Inventory Control" team reported to the Director of Accounting
and Corporate Sarbanes-Oxley Act. The March 2023 Chart also shows that Company A had a
Senior Vice President for Finance and Accounting who supervised Accounts Payable, Accounts
Receivable, and Financial Planning & Analysis, and a Senior Vice President of Finance and
Accounting. And when the entire finance team moved offices, Mr. George was left behind with
the marketing team.

In his reduced role, Mr. George reconciled inventory, conducted periodic physical counts
at all locations, reconciled inventory transfer details with operations log records every month,
reconciled inventory valuations, and assisted external auditors with annual inventory price testing.
In short, Mr. George remained Controller in name only. He was not in a position of trust
characterized by professional or managerial discretion. And his role as lead of inventory
management did not contribute in any way to the commission of the offense.

### XIII.  The Government's objections to the PSR

Certain objections that the Government made to the PSR include factual allegations that
are not part of the Factual Proffer executed on February 4, 2025, and include factual allegations
that are not relevant to sentencing. Specifically:

- The government's second objection to paragraph 22 inserts factual statements that

---

[9] Exhibit E will be filed separately, pursuant to an agreement with the Government.
[10] Exhibit G will be filed separately, pursuant to an agreement with the Government.

were not part of the Factual Proffer, including the statement about employees being members of a "Control Group" that were prohibited from trading in Company A's securities during certain "black-out periods."

- In its objection to paragraph 25, the government asserts that Mr. George "did not have, nor had arranged for, another means of employment." In addition to being irrelevant, this assertion erroneously suggests that Mr. George did not intend to work after leaving Company A. In fact, Mr. George began interviewing for new positions as early as April 2023, as shown in Exhibit H. The government also suggests, incorrectly, that Mr. George purposefully scheduled his last day to occur during a "black-out period." In fact, Mr. George attempted to resign from Company A in February 2023. *See* Exhibit I.[11] But he stayed longer than he wished, at the CEO's request.

- In its objection to paragraph 27, the government states that the following sentence is "unclear and potentially inaccurate": "financial performance, as contained in the report that George generated and sent to himself on April 7, 2023, was better than expected." This sentence was agreed to in the Factual Proffer, and the government's clarification is inaccurate.

- Finally, in its objection to paragraph 29, the government states that Mr. George owned 27,595 shares of Company A common stock. As the government concedes, that stock is "separate and apart" from the stock at issue in this case. In other words, the fact that Mr. George had employee stock is irrelevant to sentencing.

### XIV.  The Court should not impose a fine.

Finally, Mr. George respectfully requests that his sentence not include a criminal fine. Under 18 U.S.C. §3572, courts must consider, among other factors, a "defendant's income, earning capacity, and financial resources"; "the burden that the fine will impose upon the defendant"; as well as "the need to deprive the defendant of illegally obtained gains from the offense" when determining whether to impose a fine. These circumstances do not merit the imposition of a fine upon Mr. George.

As previously noted, it is extremely unlikely that Mr. George will be able to obtain

---

[11] Exhibit I will be filed separately, pursuant to an agreement with the Government.

significant employment given his relatively advanced age and impact on his reputation. He will have to rely on what is left of his investments, after paying forfeiture, restitution and legal fees, to support his family. With one son in medical school and one son graduating from high school, Mr. George needs his reserves to help pay for college, graduate school, and otherwise support himself and his wife through retirement. We therefore respectfully request that the Court not impose a fine on Mr. George beyond the mandatory assessment of $100.

## CONCLUSION

For the reasons stated herein, Mr. George respectfully asks the Court to show him and his family leniency by imposing a sentence of home confinement.

Date: April 21, 2025                                    Respectfully submitted,

                                                        **KING & RUIZ LLP**

                                                        /s/ *Gabriela M. Ruiz*
                                                        Gabriela M. Ruiz
                                                        Fla. Bar. No. 46844
                                                        2 S Biscayne Blvd., Suite 3200
                                                        Miami, FL 33131
                                                        (305) 395-4984

                                                        Mallorie A. Thomas
                                                        Fla. Bar. No. 1040370
                                                        2 S Biscayne Blvd., Suite 3200
                                                        Miami, FL 33131
                                                        (305) 395-4984

                                                        Matthew I. Menchel
                                                        Florida Bar No.12043
                                                        Adriana Riviere-Badell
                                                        Florida Bar No. 30572
                                                        KOBRE & KIM LLP
                                                        201 South Biscayne Boulevard, Suite 1900
                                                        Miami, Florida 33131
                                                        T: +1-305-967-6100
                                                        F: +1-305-967-9595
                                                        Matthew.Menchel@kobrekim.com
                                                        Adriana.Riviere-Badell@kobrekim.com

                                                        *Counsel for Stephen George*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 21st day of April 2025, I electronically filed the foregoing document with the Clerk using CM/ECF. I also certify that the foregoing is being served this day upon all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

/s/ *Gabriela M. Ruiz*

Gabriela M. Ruiz

Fla. Bar. No. 46844
