# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  <u>25-60011-CR-WPD</u>

**UNITED STATES OF AMERICA**

**vs.**

**STEPHEN GEORGE,**

   **Defendant.**

_____/

### REDACTED EXHIBITS

  Enclosed are redacted versions of documents cited in the parties' sentencing memoranda.  (*See*

Dkt. Nos. 22 and 23.)  Unredacted versions of these documents were previously emailed to Chambers,

care of Ms. Tammy Barlow.

Respectfully submitted,

| | |
|---|---|
| HAYDEN P. O'BYRNE | LORINDA I. LARYEA |
| UNITED STATES ATTORNEY | ACTING CHIEF, FRAUD SECTION |
| | CRIMINAL DIVISION |
| | U.S. DEPARTMENT OF JUSTICE |
| | |
| <u>/s/ Eli S. Rubin</u> | <u>/s/ Matthew F. Sullivan</u> |
| ELI S. RUBIN | MATTHEW F. SULLIVAN |
| Court ID No. A5503535 | Trial Attorney |
| ELIZABETH YOUNG | Court ID No. A5502369 |
| Assistant United States Attorneys | 1400 New York Avenue, N.W. |
| 99 N.E. 4th Street | Washington, DC 20530 |
| Miami, Florida 33132 | (202) 578-6583 |
| (305) 961-9247 | Email: Matthew.Sullivan2@usdoj.gov |
| Email: Eli.Rubin@usdoj.gov | |

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF on April 28, 2025.

_____*s/ Eli S. Rubin*_____
Eli S. Rubin
Assistant U.S. Attorney

DOCUMENTS CITED BY

THE UNITED STATES OF AMERICA



V. 3/1/2023

CONFIDENTIAL TREATMENT REQUESTED BY

CEL-DOJ-00000008

Message

| | |
|---|---|
| **From:** | Stephen George [ _ _ _ _ ] |
| **Sent:** | 3/29/2023 1:55:05 PM |
| **To:** | Jarrod Langhans                                    Paul Storey                              ; Seth Nicholas |
| | ]                              Tony Guilfoyle |                       ; Tyler Bohannon                          : Lex |
| | Shankle [                                 ; John Fieldly _                    ; Matthew Sabia |                Kyle |
| | Watson [                                ; Danielle Babich                       ; Marcus Sandifer |
| | David Wohlstadter                       ; Mannu Harnal |
| | Feng Liang |                              ; Grace Clarke                        : Andrea Elliott                      ; Zachary |
| | Lessman                                    ; Jussi Koskela                          Brant Burchfield |
| **Subject:** | RE: Finance Team Update |

Thank you, Jarrod,

It had been an honor working for                    for the past 5+ years. Being part of the company's exponential growth will be
an experience I can never forget.

Thank you,
Stephen George

**From:** Jarrod Langhans ·
**Sent:** Wednesday, March 29, 2023 8:52 AM
**To:** Paul Storey ·                                        Seth Nicholas ·                                : Tony Guilfoyle
·                                  Tyler Bohannon                                        ; Lex Shankle ·                              John
Fieldly · _     _ _                ; Matthew Sabia                      _ _           ; Kyle Watson ·              _      ; Danielle
Babich           _                ; Marcus Sandifer                                       ; David Wohlstadter
·                                : Mannu Harnal ·                                        Feng Liang ·                              : Grace Clarke
·                            Andrea Elliott                _                ; Zachary Lessman                            : Jussi Koskela
·                            Brant Burchfield ·
**Cc:** Stephen George ██████████████ Jarrod Langhans ·
**Subject:** Finance Team Update

Good Morning,

I am reaching out to you with some unfortunate news. Stephen George will be departing the company next Friday April
7th. He has been with the company for five years as we grew from a business generating one million dollars a week to
one that is now generating twenty million dollars per week. A company valued in the millions to one now valued in the
billions. He has seen it all within finance from AP to inventory to the monthly close and we greatly appreciate his efforts
over the years. Please join me in wishing Stephen great success in his future endeavors. We will be ordering lunch for
the team next Thursday to celebrate Stephen's contribution over the years. Please stop by and thank him for his efforts
and to wish him well.

We will be informing the finance team across the day as we are currently working through a transition plan and will
update you all with the appropriate team member within finance to reach out to for any activities that Stephen was
handling.

Please reach out to me with any questions.

Thanks

CONFIDENTIAL TREATMENT REQUESTED BY ·                                                                                    CEL-DOJ-00000011

Jarrod Langhans

CONFIDENTIAL TREATMENT REQUESTED BY

## INSIDER TRADING POLICY

### I. Introduction

The purpose of this Insider Trading Policy (the "Policy") is to promote compliance with applicable securities laws by                              and its subsidiaries                              and all directors, officers and employees thereof, in order to preserve the reputation and integrity of Celsius as well as that of all persons affiliated with it.

### II. Applicability

The Policy is applicable to all directors, officers and employees of        The Policy applies to our employees located in and outside the United States alike.

Questions regarding this policy should be directed to the Company's Chief Financial Officer.

### III. Policy

If a director, officer or any employee of the Company or any agent or advisor of the Company has material, nonpublic information relating to the Company, it is the Company's policy that neither that person nor any Related Person (as defined below) may buy or sell securities of the Company (the "Company Securities") or engage in any other action to take advantage of, or pass on to others, that information.

To avoid even the appearance of impropriety, additional restrictions on trading Company Securities apply to directors and members of executive management. See Section VI.

### IV. Definitions/Explanations

#### A. Who is an "Insider?"

Any person who possesses material, nonpublic information is considered an insider as to that information. Insiders include Company directors, officers, employees, independent contractors and those persons in a special relationship with the Company, e.g., its auditors, consultants or attorneys. The definition of insider is transaction specific; that is, an individual is an insider with respect to each material, nonpublic item of which he or she is aware.

#### B. What is "Material" Information?

The materiality of a fact depends upon the circumstances. A fact is considered "material" if there is a substantial likelihood that a reasonable investor would consider it important in making a decision to buy, sell or hold a security or where the fact is likely to have a significant effect on the market price of the security. Material information can be positive or negative and can relate to virtually any aspect of a company's business or to any type of security – debt or equity.

Some examples of material information include:

- Unpublished financial results

- News of a pending or proposed company transaction
- Significant changes in corporate objectives
- News of a significant sale of assets
- Changes in dividend policies
- Financial liquidity problems
- Significant agreement with customer

The above list is only illustrative; many other types of information may be considered "material," depending on the circumstances. The materiality of particular information is subject to reassessment on a regular basis.

## C. What is "Nonpublic" Information?

Information is "nonpublic" if it is not available to the general public. In order for information to be considered public, it must be widely disseminated in a manner making it generally available to investors through such electronic media as Yahoo Finance or other large printed media. The circulation of rumors, even if accurate and reported in the media, does not constitute effective public dissemination.

In addition, even after a public announcement of material information, a reasonable period of time must elapse in order for the market to react to the information. Generally, one should allow approximately two full trading days following publication as a reasonable waiting period before such information is deemed to be public. Therefore, if an announcement is made before the commencement of trading on a Monday, an employee may trade in Company Securities starting on Wednesday of that week, because two full trading days would have elapsed by then (all of Monday and Tuesday). If the announcement is made on Monday after trading begins, employees may not trade in Company Securities until Thursday. If the announcement is made on Friday after trading begins, employees made not trade in Company Securities until Wednesday of the following week.

## D. Who is a "Related Person?"

For purposes of this Policy, a Related Person includes your spouse, minor children and anyoneelse living in your household; partnerships in which you are a general partner; trusts of which you are a trustee; estates of which you are an executor; and other equivalent legal entities that you control. Although a person's parent or sibling may not be considered a Related Person (unless living in the same household), a parent or sibling may be a "tippee" for securities lawspurposes. See Section V.D. below for a discussion on the prohibition on "tipping."

## V. Guidelines

### A. Non-disclosure of Material Nonpublic Information

Material, nonpublic information must not be disclosed to anyone, except the persons within the Company or third party agents of the Company (such as investment banking advisors or outside legal counsel) whose positions require them to know it, until such information has been publicly released by the Company.

### B. Prohibited Trading in Company Securities

No person may place a purchase or sell order or recommend that another person place a purchase or sell order in Company Securities when he or she has knowledge of material information

concerning the Company that has not been disclosed to the public. Loans, pledges, gifts, charitable donations and other contributions of Company Securities are also subject to thisPolicy.

## C. Twenty-Twenty Hindsight

If securities transactions ever become the subject of scrutiny, they are likely to be viewed after-the-fact with the benefit of hindsight. As a result, before engaging in any transaction an insider should carefully consider how his or her transaction may be construed in the bright light of hindsight. Again, in the event of any questions or uncertainties about the Policy, please consult the Company's Chief Financial Officer or someone that he or she has delegated responsibility for advising of the Policy.

## D. "Tipping" Information to Others

Insiders may be liable for communicating or tipping material nonpublic information to any third party ("tippee"), not limited to just Related Persons. Further, insider trading violations are not limited to trading or tipping by insiders. Persons other than insiders also can be liable for insider trading, including tippees who trade on material, nonpublic information tipped to them and individuals who trade on material, nonpublic information which has been misappropriated.

Tippees inherit an insider's duties and are liable for trading on material, nonpublic information illegally tipped to them by an insider. Similarly, just as insiders are liable for the insider trading of their tippees, so are tippees who pass the information along to others who trade. In other words, a tippee's liability for insider trading is no different from that of an insider. Tippees canobtain material, nonpublic information by receiving overt tips from others or through, among other things, conversations at social, business or other gatherings.

## E. Avoid Speculation

Directors, officers and employees, and their Related Persons may not trade in options, warrants, puts and calls or similar instruments on Company Securities or sell Company Securities "short", including a "sale against the box," defined as a sale with delayed delivery. In addition, directors, officers and employees, and their Related Persons may not hold Company Securities in margin accounts. Investing in Company Securities provides an opportunity to share in the future growth of the Company. Investment in the Company and sharing in the growth of the Company, however, does not mean short-range speculation based on fluctuations in the market. Such activities may put the personal gain of the director, officer or employee in conflict with the best interests of the Company and its securityholders. Anyone may, of course, in accordance with thisPolicy and other Company policies, exercise options granted to them by the Company.

## F. Trading in Other Securities

No director, officer or employee may place purchase or sell orders or recommend that another person place a purchase or sell order in the securities of another company if the person learns of material, nonpublic information about the other company in the course of his/her employment with Celsius.

## G. Hedging

No Insider may engage in hedging transactions involving Company securities, including forward sale or purchase contracts, equity swaps, collars or exchange funds. Such transactions are speculative in nature and therefore create the appearance that the transaction is based on nonpublic information.

## H. Trading on Margin or Pledging

CEL-DOJ-00000059

No Insider may hold Company securities in a margin account or pledge (hypothecate) Company securities as collateral for a loan. Margin sales or foreclosure sales may occur at a time when the Insider is aware of material nonpublic information or otherwise is not permitted to trade in Company Securities.

## VI. Additional Restrictions and Requirements for Directors, Officers and "Control Group"

### A. Who is part of "Control Group"

All directors of the Board, officers of Celsius Holdings, Inc., employees at VP and director level, all employees reporting directly to the Chief Financial Officer and all Related Person to this group of people are part of the Control Group.

### B. Black-out period, transactions prohibited and allowed

#### Period

The Black-out period is the period which starts on the first day of the last calendar month of the fiscal quarter until two full trading days after the release of the Company's quarterly or annual earnings. In addition to the standard end-of-quarter blackout periods, the Company may, from time to time, impose other blackout periods upon notice to those persons who are affected. Employees not otherwise subject to the blackout periods are encouraged to refrain from trading Company Securities during blackout periods to avoid the appearance of improper trading.

#### Prohibited transactions

During the Black-out period members of the Control Group may not purchase or sell Company securities, or exercise of stock options where all or a portion of the acquired stock is sold during the blackout period.

#### Allowed transactions

- Exercise of stock options where no Company Securities are sold in the market to fund the option exercise.
- Gifts of Company Securities, unless you have reason to believe the recipient intends to sell the shares during the current blackout period.
- Transfers of Company Securities to or from a trust.
- Transactions that comply with SEC Rule 10b5-1 pre-arranged written plans; provided that:
    - the (i) the Rule 10b5-1 Plan was adopted during a window period and while the person adopting the Rule 10b5-1 Plan was not in possession of material non-public information;
    - (ii) the Rule 10b5-1 Plan and all amendments, other than termination amendments, were approved by Chief Financial Officer or Chief Executive Officer, with such approval not to be unreasonably withheld; and
    - (iii) a correct and complete copy of the Rule 10b5-1 Plan, including all amendments thereto, has been provided to the Chief Financial Officer or Chief Executive officer.

    For further information about pre-arranged plans, please contact the Chief Financial Officer.

### C. Pre-Clearance

Any member of the Control Group (as defined above) must obtain prior clearance from the Company's Chief Financial Officer, Chief Executive Officer, or their respective designee, before he, she or a Related Person makes any purchases or sales of Company Securities. Prior clearance is required for all purchases or sales. Each proposed transaction will be evaluated to determine if it raises insider trading concerns. Any advice will relate solely to the restraints imposed by law and will not constitute advice regarding the investment aspects of any transaction or the notice and filing requirements thereof (e.g., Form 4, etc.) which remain the sole responsibility of the individual. Clearance of a transaction is valid only for a 48-hour period. If the transaction order is not placed within that 48-hour period, clearance of the transaction must be re-requested. If clearance is denied, the fact of such denial must be kept confidential by the person requesting such clearance.

## VII. Other

The Board of Directors may, in its discretion, authorize additional exceptions to any restrictions set forth in this policy, upon a determination by the Board of Directors or the Audit Committee, as applicable, that such exception would be consistent with the overarching purpose of this policy to prohibit officers, directors and employees from trading in the public markets in securities of Altair or its Business Partners while in the possession of material, nonpublic information regarding the issuer of such securities.

## VIII. Certification

### INSIDER TRADING POLICY CERTIFICATION

To

I,_____(name), have received and read a copy of the foregoing
Insider Trading Policy (the "Policy") adopted by _____ (the "Company"). I
hereby agree to comply with the specific requirements of the Policy in all respects during my
employment or other service relationship with the Company. I understand that my failure to
comply in all respects with the Policy is a basis for termination for cause of my employment or
other service relationship with the Company and may result in other civil or criminal penalties.

_____

(Signature)

_____

(Date)

**To:** John Fieldly|        Jarrod Langhans        Feng Liang|        Stephen George|        Jussi Koskela
        Zachary Lessman        : Dylan Marsolek|        Jeffrey Alvarado|        : Maria Bejanyan
        Joseph Donato|

**From:** Greg Caton[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=10CDF3AE788D4FAEBEDE69ED2D9240B8-GREG CATON]

**Sent:** Wed 3/29/2023 2:22:50 PM Eastern Daylight Time

**Subject:** Period 2 Financial Close

**Attachment:** 02 Feb 2023 Financial Close Pkg Consolidated Final.pdf

Team –

Please see attached for final Period 2 results. Jussi will send Customer P&L and Sales by SKU info when available.

Best Regards,
Greg

CONFIDENTIAL TREATMENT REQUESTED BY

CEL-DOJ-00000198

# TABLE OF CONTENTS                    Page No

| | |
|---|---|
| **MONTH END RESULTS vs BUDGET & LY** | **3** |
| **DOMESTIC VS. INTERNATIONAL FEBRUARY TY & LY** | **4** |
| **BALANCE SHEET** | **5** |
| **ADJUSTED EBITDA FEBRUARY AND QTD** | **6** |

| | | Current Year Actual Vs Current Year Budget | | | | Current Year Actual Vs Prior Year Actual | | |
|---|---|---|---|---|---|---|---|---|
| | | Feb-23 | | Variance | | Feb-22 | Variance | |
| | Current | Budget | $ | % | | Prior | $ | % |
| **Net Invoiced** | 125,825,964 | | 40,988,317 | | | 44,687,850 | 81,138,114 | 181.6% |
| Discount, Bill Backs etc | (25,199,884) | | (7,418,500) | | | (10,342,752) | (14,857,132) | 143.6% |
| Revenue | 100,626,080 | | 33,569,818 | | | 34,345,098 | 66,280,982 | 193.0% |
| | -20.0% | | | | | | | |
| Cost of Product | (48,425,500) | | (13,505,312) | | | (19,026,575) | (29,398,925) | 154.5% |
| Freight cost | (4,749,953) | | (1,381,289) | | | (2,638,702) | (2,111,251) | 80.0% |
| **Cost of Goods Sold** | (53,175,453) | | (14,886,601) | | | (21,665,277) | (31,510,176) | 145.4% |
| **Gross Profit** | 47,450,627 | | 18,683,216 | | | 12,679,821 | 34,770,806 | 274.2% |
| **Gross Profit % of Revenue** | 47.2% | | 4.3% | | | 36.9% | 10.2% | 27.7% |
| Broker Cost | 5,816 | | 5,816 | | | 406,579 | (400,763) | (98.6%) |
| Other sales expense | 647,116 | | (1,566,724) | | | 465,893 | 181,223 | 38.9% |
| Storage & distribution | 1,051,717 | | (2,400,960) | | | 1,942,226 | (890,509) | (45.8%) |
| Sales employee cost | 1,413,085 | | (768,474) | | | 1,477,509 | (64,424) | (4.4%) |
| Marketing employee cost | 641,163 | | (303,440) | | | 343,424 | 297,739 | 86.7% |
| Marketing Costs | 6,210,787 | | (1,321,992) | | | 5,930,951 | 279,836 | 4.7% |
| **Marketing and Sales Total** | 9,969,684 | | (6,355,774) | | | 10,566,582 | (596,898) | (5.6%) |
| **Marketing and Sales % of Revenue** | 10% | | (14%) | | | 31% | (21%) | (68%) |
| Admin employee cost | 1,467,860 | | 107,634 | | | 575,754 | 892,106 | 154.9% |
| Admin Expenses | 2,005,771 | | (357,632) | | | 1,043,922 | 961,849 | 92.1% |
| R&D/Testing | 119,789 | | 94,734 | | | 48,648 | 71,141 | 146.2% |
| Acquisition Exp - Project Transatiantica | | | 0 | | | 0 | 0 | 0.0% |
| Abnormal Prodcution cost | 0 | | 0 | | | 0 | 0 | 0.0% |
| Option Expense | 2,942,955 | | 962,955 | | | 2,104,583 | 838,372 | 39.8% |
| Excise Taxes | 28,244 | | 28,244 | | | 13,982 | 14,262 | 102.0% |
| Amortization of Intangibles | 44,915 | | 44,915 | | | 47,583 | (2,668) | (5.6%) |
| Depreciation and Amortization | 133,060 | | (245,163) | | | 86,600 | 46,460 | 53.6% |
| **Administrative Total** | 6,742,594 | | 635,687 | | | 3,921,072 | 2,821,522 | 72.0% |
| **Admininstrative % of Revenue** | 7% | | (2%) | | | 11% | (5%) | (41%) |
| **Total S, G & A** | 16,712,278 | | (5,720,087) | | | 14,487,654 | 2,224,624 | 15.4% |
| **SG&A as % of Revenue** | 17% | | (17%) | | | 42% | (26%) | (61%) |
| **Income/(Loss) from Operations** | 30,738,349 | | 24,403,303 | | | (1,807,833) | 32,546,182 | 1800.3% |
| Interest Income | 35,478 | | 35,478 | | | 25,881 | 9,597 | 37.1% |
| Interest Income | 1,550,606 | | 1,550,606 | | | 2 | 1,550,604 | 77530200.0% |
| Other Income/(Expense)-Misc | 50 | | 50 | | | 380 | (330) | (86.8%) |
| Other Non-Operating Income | (485,626) | | (485,626) | | | 36,692 | (522,318) | (1423.5%) |
| Dividend Interest | 0 | | 0 | | | 0 | 0 | 0.0% |
| Management Fee Income | 0 | | 0 | | | 0 | 0 | 0.0% |
| Interest Expense | 0 | | 0 | | | 0 | 0 | 0.0% |
| Interest Expense on Financial Lease Obligations | (520) | | (520) | | | (545) | 25 | (4.6%) |
| Amortization Discount on Bonds Payble | 0 | | 0 | | | 0 | 0 | 0.0% |
| Amortization of Intangibles | 0 | | 0 | | | 0 | 0 | 0.0% |
| Amortization on financing leases | 0 | | 0 | | | 0 | 0 | 0 |
| Management Fee Expense | 0 | | 0 | | | 190 | (190) | (100.0%) |
| Lease Amort Financial | 0 | | 0 | | | 0 | 0 | 0.0% |
| Interest Expense - Intercompany | 0 | | 0 | | | 162 | (162) | (100.0%) |
| Loss on Debt Extinguishment | 0 | | 0 | | | 0 | 0 | 0.0% |
| Equity pickup in subsidiary Profit/Loss | 0 | | 0 | | | 0 | 0 | 0.0% |
| Extraordinary gain | 0 | | 0 | | | 0 | 0 | 0.0% |
| Exchange gain/(loss) on settled transactions | (5,509) | | 141,158 | | | (52,865) | 47,356 | (89.6%) |
| **Total Other Income/(Expense)** | 1,094,479 | | 1,241,146 | (i | | 9,897 | 1,084,582 | 10958.7% |
| **Net income/(loss) before tax** | 31,832,828 | | 25,644,449 | | | (1,797,936) | 33,630,764 | 1870.5% |
| Income Tax Benefit | 0 | | 0 | | | 0 | 0 | 0.0% |
| **Net Income/(Loss) to C/S holders** | 31,832,828 | | 25,644,449 | | | (1,797,936) | 33,630,764 | 1870.5% |

CEL-DOJ-00000200

Summary of All Units
For the Month Ending Tuesday, February 28th, 2023

| | 2023 February | | | | | | | | 2022 February | | | | | | | |
| | Domestic | Europe | SEA | China | Asia | Other INTL | Total INTL | Total | Domestic | Europe | SEA | China | Asia | Other INTL | Total INTL | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Revenue | | | | | | | | $125,825,964 | | | | | | | | $44,687,850 |
| Promotions, etc. | | | | | | | | (25,199,884) | | | | | | | | ($10,342,752) |
| Revenue | | | | | | | | 100,626,080 | | | | | | | | 34,345,098 |
| Cost of Product | | | | | | | | (48,425,500) | | | | | | | | (19,026,576) |
| Freight cost | | | | | | | | (4,749,952) | | | | | | | | (2,638,702) |
| Gross Profit | | | | | | | | 47,450,628 | | | | | | | | 12,679,820 |
| GP % | | | | | | | | 47.2% | | | | | | | | 36.9% |
| Product cost% of gross revenue | | | | | | | | (48.1%) | | | | | | | | (55.4%) |
| Freight % of gross revenue | | | | | | | | (4.7%) | | | | | | | | (7.7%) |
| | | | | | | | | | | | | | | | | |
| Sales employee cost | | | | | | | | 1,413,085 | | | | | | | | 1,477,508 |
| Sales cost,incl demos | | | | | | | | 1,704,649 | | | | | | | | 2,814,699 |
| Marketing employee cost | | | | | | | | 641,162 | | | | | | | | 343,424 |
| Marketing Costs | | | | | | | | 6,210,788 | | | | | | | | 5,930,950 |
| Admin employee cost | | | | | | | | 1,467,860 | | | | | | | | 575,753 |
| Admin Expenses - Office related | | | | | | | | 336,275 | | | | | | | | 175,237 |
| Admin Expenses - Insurance and Misc | | | | | | | | 1,669,494 | | | | | | | | 868,665 |
| Abnormal Production Cost | | | | | | | | 0 | | | | | | | | |
| Acquisition Exp - Project Transatlantica | | | | | | | | 0 | | | | | | | | |
| R&D/Studies | | | | | | | | 119,789 | | | | | | | | 48,648 |
| Total Expense | | | | | | | | 13,563,103 | | | | | | | | 12,234,964 |
| Expense % | | | | | | | | 13.5% | | | | | | | | 36% |
| | | | | | | | | | | | | | | | | |
| Financial Expense | | | | | | | | | | | | | | | | |
| Equity pickup in subsidiary Profit/Loss | | | | | | | | 0 | | | | | | | | 0 |
| Taxes | | | | | | | | 28,244 | | | | | | | | 13,982 |
| Interest Expense,net | | | | | | | | (1,099,987) | | | | | | | | (62,762) |
| Gain or Loss on Foreign Exchange | | | | | | | | 5,510 | | | | | | | | 52,865 |
| Net Income(Loss) Cash | | | | | | | | 34,953,758 | | | | | | | | 446,831 |
| Non-cash expense | | | | | | | | 3,120,930 | | | | | | | | 2,238,767 |
| Net income(loss) before OCI gain/(loss) | | | | | | | | 31,832,828 | | | | | | | | (1,797,936) |

CONFIDENTIAL TREATMENT REQUESTED BY

Consolidated Balance Sheet as of 2/28/23

| | 2/28/2023 | 12/31/2022 | 9/30/2022 | 6/30/2022 | 3/31/2022 | 12/31/2021 |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Current Assets | | | | | | |
| Cash | 622,890,892 | | | | | |
| Accounts receivable, net of allowances | 156,162,254 | | | | | |
| Accounts receivable, Contra Credit | (1,446,152) | | | | | |
| Notes receivable | 2,962,311 | | | | | |
| Prepaid Expenses | 10,532,612 | | | | | |
| Deposits | 13,173,237 | | | | | |
| Defer Revenue ST | 2,278,097 | | | | | |
| Other current assets | 570,269 | | | | | |
| Inventory net of allowances | 162,609,273 | | | | | |
| Pepsi Preferred Valuation - ST | 14,123,500 | | | | | |
| Intercompany receivables | (1) | | | | | |
| **Total Current Assets** | **983,856,292** | | | | | |
| | | | | | | |
| Long Term Assets | | | | | | |
| Property plant & equipment, net | 11,860,303 | | | | | |
| Right of Use of Asset-Operational | 859,052 | | | | | |
| Right of Use of Asset-Financial | 193,936 | | | | | |
| Deferred Tax Asset | 499,312 | | | | | |
| Investment in Subsidiary | 0 | | | | | |
| Goodwill | 13,619,913 | | | | | |
| Customer Lists | 11,666,921 | | | | | |
| Brand Equity | 444,373 | | | | | |
| LT-Notes Receivable | 3,554,775 | | | | | |
| Pepsi Preferred Valuation - LT | 260,107,793 | | | | | |
| Other LT Assets | 262,661 | | | | | |
| **Total Long Term Assets** | **303,069,039** | | | | | |
| **Total Assets** | **1,286,925,331** | | | | | |
| | | | | | | |
| **Liabilities & Equity** | | | | | | |
| Current Liabilities | | | | | | |
| Accounts Payable, Net | 41,011,474 | | | | | |
| Accrued Expenses | 141,313,921 | | | | | |
| Deferred Tax/Sales Tax/VAT | (8,426) | | | | | |
| Lease Obligation-PV Operational | 619,610 | | | | | |
| Lease Obligation-PV Financial | 68,341 | | | | | |
| Bottle/Can deposit | 3,772,659 | | | | | |
| Customer deposits | 0 | | | | | |
| Defered Revenue- ST | 9,674,707 | | | | | |
| Terminations Payable | 2,690,663 | | | | | |
| Intercompany liabilities | 1 | | | | | |
| **Total Current Liabilities** | **199,142,948** | | | | | |
| | | | | | | |
| Long Term Liability | | | | | | |
| Defered Revenue- Termination LT | 177,607,641 | | | | | |
| Leasing Oligation Liability Operating | 252,128 | | | | | |
| Leasing Oligation Liability Financial | 155,553 | | | | | |
| Deferred Tax Liabilities | 2,335,300 | | | | | |
| **Total LT Liabilities** | **180,350,622** | | | | | |
| | | | | | | |
| **Total Liabilities** | **379,493,570** | | | | | |
| | | | | | | |
| **Equity** | | | | | | |
| Preferred stock | 824,487,888 | | | | | |
| Common stock | 76,376 | | | | | |
| APIC | 284,063,971 | | | | | |
| Accumulated Comprehensive Income/Deficit (CTA) | (2,047,945) | | | | | |
| Accumulated Income/Deficit - CY | 39,624,663 | | | | | |
| Accumulated Income/Deficit | (238,773,192) | | | | | |
| **Total Equity** | **907,431,761** | | | | | |
| **Total Liabilities & Equity** | **1,286,925,331** | | | | | |

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS HOLDINGS, INC.

CEL-DOJ-00000202

|  | Feb-23 | | Variance | |
|---|---|---|---|---|
|  | Current | Budget | $ | % |
| Net Income (Loss) (GAAP Measure) | 31,832,828 | | | |
| *Add back / (Deduct)* | | | | |
| Income Tax benefit | - | | | |
| Depreciation and amortization expense | 177,975 | | | |
| Net Interest | (1,585,564) | | | |
| **Non-GAAP EBITDA** | 30,425,239 | | | |
| Stock-based compensation | 2,942,955 | | | |
| Foreign Exchange | 5,509 | | | |
| **Non-GAAP Adjusted EBITDA** | 33,373,703 | | | |
| % of Net Revenue | 33% | | | |

|  | Current QTD Actual Vs Current QTD Budget | | | |
|---|---|---|---|---|
|  | Feb-23 | | Variance | |
|  | Current | | $ | % |
| Net Income (Loss) (GAAP Measure) | 39,671,085 | | | |
| *Add back / (Deduct)* | | | | |
| Income Tax benefit | (215,422) | | | |
| Depreciation and amortization expense | 342,492 | | | |
| Net Interest | (3,196,810) | | | |
| **Non-GAAP EBITDA** | 36,601,345 | | | |
| Stock-based compensation | 2,942,955 | | | |
| Foreign Exchange | 41,133 | | | |
| **Non-GAAP Adjusted EBITDA** | 39,585,433 | | | |
| % of Net Revenue | 24% | | | |

**To:** Jarrod Langhans[          ; John Fieldly]

**Cc:** Danielle Babich[         ]

**From:** Stephen George[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=9490BF38CE9A4AEF96E90D63D9D59968-STEPHEN GEO]

**Sent:** Mon 3/27/2023 9:46:08 AM Eastern Daylight Time

**Subject:** Resignation Notice

Good Morning,

First and foremost, I would like to thank John Fieldly and       for allowing me to work here for the past five-plus years. It was a fantastic journey; we saw our company achieve new heights and go to the next level from the time I joined till date.

Unfortunately, I won't be a part of      moving forward. Recent events have led me to re-evaluate my position here, and I felt that it was not the right environment for me. Since the start of Q3, there's been a handful of changes, some of which have directly influenced my decision today. On certain occasions, my contribution to the team is overlooked and not valued. On many occasions, there has been discrimination between members of the old and new teams, and at this phase in my career, it's not something I am looking forward to dealing with. For the above reasons, I am submitting my resignation with two weeks' notice. I have accrued PTOs and floating days that I worked during the audit period, which I would want to take or be compensated for. Once again, I would like to thank John,      and my team for the last five+ years. As always,

Thank you,
Stephen George

Stephen George
VP, Corporate Controller
P 954 871 7282

                        :aton, FL 33431

CONFIDENTIAL TREATMENT REQUESTED BY

# *George, Stephen - Vol. I.20230308.434900-HQ*

### *3/8/2023 9:06 AM*

**Full-size Transcript**

**Prepared by:**

Monday, December 11, 2023

1

1    THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:            )

4                                 )

5                                 )

6

7    WITNESS:  Stephen George

8    PAGES:    1 through 238

9    PLACE:    Securities and Exchange Commission

10             100 F Street, N.E.

11             Washington, D.C. 20549

12   DATE:     Wednesday, March 8, 2023

13

14       The above-entitled matter came on for hearing,

15   pursuant to notice, at 9:06 a.m.

16

17

18

19

20

21

22

23

24       Diversified Reporting Services, Inc.

25                 (202)467-9200

2

```
1    APPEARANCES:

2

3    On behalf of the Securities and Exchange Commission:

4         ASHLEY SPRAGUE, ESQ.

5         LISA DEITCH, ESQ.

6         AVRON ELBAUM, CPA

7         Securities and Exchange Commission

8         Division of Enforcement

9         100 F Street, N.E.

10        Washington, D.C. 20549

11

12   On behalf of the Witness:

13        ROBERT POMMER, ESQ.

14        BRYAN CRUZ, ESQ.

15        Proskauer Rose, LLP

16        1001 Pennsylvania Ave, N.W.

17        Suite 600 South

18        Washington, D.C. 20004

19

20   On behalf of                      and the Witness:

21        DAVID WOHLSTADTER, ESQ.

22

23

24        Boca Raton, FL 33486

25
```

3

```
 1                        C O N T E N T S

 2     WITNESS                                 EXAMINATION

 3     Stephen George                               6

 4     EXHIBITS:        DESCRIPTION              IDENTIFIED

 5       1              SEC Form 1662                 10

 6       2              Audiovisual Testimony Procedures   9

 7       6              10-K                          83

 8                      Dated 12/31/17

 9       9              10-K for                     199

10                      Dated 12/31/19

11      84              Email, R. Char to E. Negron,  107

12                      et al., Bates CEL-SEC-0031375

13      99              Email, R. Char to T. Xu,      177

14                      et al., Bates CEL-SEC-0006473

15     135              Email, E. Negron to S. Dannelly,  71

16                      Bates CEL-SEC-0032785

17     174              Subpoena Dated 2/16/23         10

18     175              Background Questionnaire        11

19     176              Internal Control Report,        88

20                      Bates        -0002428

21     177              Internal Control Report FRP,    91

22                      Bates CEL-SEC-0026560

23     179              Email, J. Blank to S. George,   96

24                      Bates CEL-SEC-0034262

25
```

4

```
 1                  C O N T E N T S(CONT.)

 2     EXHIBITS      DESCRIPTION                    IDENTIFIED
```

| | EXHIBITS | DESCRIPTION | IDENTIFIED |
|---|---|---|---|
| 3 | 180 | Email, S. George to J. Blank, | 98 |
| 4 | | et al., Bates CEL-SEC-0046295 | |
| 5 | 181 | SEC Comment Letter | 86 |
| 6 | 183 | Journal Entry #75, 4/16/19, | 214 |
| 7 | | Bates CEL-SEC-0041451 | |
| 8 | 184 | Journal Entry #134, 1/18/22, | 216 |
| 9 | | Bates CEL-SEC-0041452 | |
| 10 | 185 | Beijing Balance Sheet, | 201 |
| 11 | | Bates CEL-SEC-0019273 | |
| 12 | 187 | Journal Entry #135, 1/18/2022, | 219 |
| 13 | | Bates CEL-SEC-0041453 | |
| 14 | 190 | Email, R. Char to S. George, | 112 |
| 15 | | et al., Bates CEL-SEC-0043273 | |
| 16 | 191 | Email, E. Negron to S. George, | 187 |
| 17 | | et al., Bates CEL-SEC-0014553 | |
| 18 | 193 | Email, R. Char to S. George, | 143 |
| 19 | | et al., Bates CEL-SEC-0031751 | |
| 20 | 194 | Email, R. Char to E. Negron, | 173 |
| 21 | | et al., Bates CEL-SEC-0006564 | |

```
22

23

24

25
```

5

```
 1                    P R O C E E D I N G S

 2            MS. SPRAGUE:  So we are on the record at 9:06

 3    a.m., Eastern on March 8th, 2023.  This is an

 4    investigation by the United States Securities and

 5    Exchange Commission in the matter of

 6        to determine whether there has been violations of

 7    certain provisions of the federal securities laws.

 8    However, the facts developed in this investigation might

 9    constitute violations of other federal or state civil or

10    criminal laws.  I am Ashley Sprague, a staff attorney in

11    enforcement.  Also joining me today will be Lisa Deitch,

12    an assistant director in enforcement, and Avron Elbaum,

13    an SEC accountant.  We are all officers of the

14    commission for purposes of the proceeding.  I want to

15    note that today's proceeding is being conducted remotely

16    by videoconference due to the current COVID-19 emergency

17    and participants are in various locations.  The witness

18    and his counsel have consented to today's testimony

19    being conducted remotely as well as having the oath

20    administered remotely.  Is that correct, Mr. Pommer?

21            MR. POMMER:  Yes, that's correct.

22            MS. SPRAGUE:  And is that correct, Mr.

23    Wohlstadter?

24            MR. WOHLSTADTER:  Yes.

25            MS. SPRAGUE:  And is that correct, Mr. George?
```

6

 1          MR. GEORGE:  Yes.

 2          MS. SPRAGUE:  Mr. George, if you could, please

 3    raise your right hand for the oath.  Do you swear to

 4    tell the truth, the whole truth and nothing but the

 5    truth?

 6          MR. GEORGE:  Yes.

 7    Whereupon,

 8                         STEPHEN GEORGE

 9    was called as a witness and, having been first duly

10    sworn, was examined and testified as follows:

11                         EXAMINATION

12          BY MS. SPRAGUE:

13      Q    Could you please state your full name and

14    spell your name for the record.

15      A    Stephen George, S-t-e-p-h-e-n, G-e-o-r-g-e.

16      Q    Are you known by any other name?

17      A    No.

18      Q    Mr. George, are you represented by counsel

19    here today?

20      A    Yes.

21      Q    Will counsel for the witness please identify

22    themselves, spell your names for the record and provide

23    your addresses?

24          MR. POMMER:  Yes.  It's Robert W. Pommer, P-o-

25    m-m-e-r, here on behalf of the witness with the law firm

7

```
1    Proskauer Rose.  The address is 1001 Pennsylvania Ave,

2    N.W., Suite 600 South, Washington D.C., 20004.

3              MS. SPRAGUE:  And are you representing Mr.

4    George as his counsel here today?

5              MR. POMMER:  Yes.  I am.

6              MS. SPRAGUE:  And, Mr. Wohlstadter, could you

7    please identify yourself, spell your name for the record

8    and provide your address?  Sorry, I can't hear you.  I

9    don't think that Kevin can hear you.

10             MR. WOHLSTADTER:  The speaker is across the

11   room there.  My name is David Wohlstadter.  That's D-a-

12   v-i-d, W-o-h-l-s-t-a-d-t-e-r, address is

13                   Boca Raton, Florida, 33486.

14             MS. SPRAGUE:  And your title or where you

15   work, Mr. Wohlstadter?

16             MR. WOHLSTADTER:  I work at

17      and my title is associate general counsel at

18   litigation and investigations and I am here representing

19   Mr. George.

20             MS. DEITCH:  And are you representing him as

21   an employee of the company?

22             MR. WOHLSTADTER:  As a current employee at the

23   company, correct.

24             MS. DEITCH:  Okay.

25             MS. SPRAGUE:  And, Mr. Cruz, you're with the
```

```
 1    same firm as Mr. Pommer?

 2            MR. CRUZ:  Yes.  I am Bryan A. Cruz, B-r-y-a-

 3    n, A is the middle initial, C-r-u-z.

 4            BY MS. SPRAGUE:

 5       Q    Thank you.  Just a few procedural guidelines,

 6    Mr. George.  We are on the record, so please give your

 7    responses verbally.  Please wait for me to finish my

 8    question before answering to prevent talking over one

 9    another.  If there is a question you don't understand

10    please let me know and I will rephrase the question.

11    The commission staff controls when we go on the record

12    and when we go off.  If you want to go off the record

13    please let me know and we will take the next opportunity

14    to go off the record.  Whenever we go off the record all

15    conversations that might occur off the record with your

16    counsel or you and the staff will be summarized by the

17    staff when the record is reopened.  At that time the

18    staff will request counsel to confirm the accuracy of

19    the staff's summary.  Mr. George, are you under the

20    influence of any drugs or medicine or alcohol today that

21    would impact your ability to testify truthfully and

22    fully?

23       A    No.

24       Q    Any reason you can't testify truthfully here

25    today?
```

1        A    No.

2        Q    I'm showing you what has been marked as

3   Exhibit 2, the procedures for testimony by audiovisual

4   means.  Can you see the document?

5                          (SEC Exhibit No. 2 was marked

6                           for identification.)

7        A    Yes.

8        Q    Have you read these procedures?

9        A    Yes.

10        Q    And do you agree to abide by the procedures

11   listed in this exhibit?

12        A    Yes.

13        Q    And, counsel, do you also agree?

14             MR. POMMER:  Yes.  We agree.

15             MS. SPRAGUE:  And Mr. Wohlstadter?

16             MR. WOHLSTADTER:  Yes.

17             BY MS. SPRAGUE:

18        Q    And just a few reminders from these

19   procedures, during the testimony session you should not

20   review or rely on any documents or information other

21   than the materials that we will show you through Webex

22   and, Mr. Pommer and Mr. Wohlstadter, we just ask that

23   you let us know if you communicate with your clients

24   while we're on the record.  Mr. George, prior to the

25   opening of the record you also were provided with a copy

```
 1    of the formal order of investigation in this matter.

 2    Mr. George, have you had an opportunity to review the

 3    formal order?

 4         A    Yes.

 5         Q    I am showing you now what has been marked as

 6    Exhibit 1.  This is the SEC's Supplemental Information

 7    Form 1662.  This one was also included as an attachment

 8    to the subpoena that was issued to you.  Mr. George,

 9    have you had an opportunity to read this Exhibit 1?

10                        (SEC Exhibit No. 1 was marked

11                         for identification.)

12         A    Yes.

13         Q    Do you have any questions regarding this

14    notice?

15         A    No.

16         Q    Mr. George, I'm showing you what has been

17    marked as Exhibit 174.  It is a copy of the cover letter

18    and subpoena issued to you on February 16th, 2023.  Is

19    this a copy of the subpoena pursuant to which you are

20    appearing for testimony here today?

21                        (SEC Exhibit No. 174 was marked

22                         for identification.)

23         A    Yes.

24         Q    I am showing you now what has been marked as

25    Exhibit 175.  It is the background questionnaire that
```

```
 1    your counsel provided to us last night.  Do you see the

 2    document, Mr. George?

 3                        (SEC Exhibit No. 175 was marked

 4                         for identification.)

 5         A    Yes.

 6         Q    And do you recognize this document?

 7         A    Yes.

 8         Q    Did you complete the responses to this

 9    background questionnaire, Mr. George?

10         A    Yes.

11         Q    Did anyone assist you?

12         A    No.

13         Q    Are the answers in this questionnaire accurate

14    and complete?

15         A    Yes.

16         Q    Mr. George, where do you live?

17         A    Parkland, Florida currently.

18         Q    I'm sorry, I didn't catch the city name.

19         A    Parkland, Florida.

20         Q    Oh.  Parkland, Florida.  And what's your

21    address?

22         A    It's                            , Parkland,

23    Florida, 33076.

24         Q    The street name was Northwood?

25         A
```

1    Q    Thank you.  And how long have you lived there?

2    A    Since 2009, I am living in Parkland.

3    Q    But moved at different locations in Parkland

4  or all at that same address?

5    A    No.  I moved from different locations in

6  Parkland.

7    Q    Okay, but since 2009, you've lived in

8  Parkland?

9    A    Correct.

10    Q    Now in the background questionnaire you

11  provided your educational history.  It looks like you

12  obtained a bachelor's of science in math in May of 1990

13  from the University of Kerala.  Is that correct?

14    A    Correct.

15    Q    And then in May of 1993, you obtained a CA in

16  intermediate accounting from The Institute of Chartered

17  Accountants of India, correct?

18    A    Yes.

19    Q    I'm sorry, what?

20    A    Yes.  I studied CA intermediate between 1990

21  and 1993.

22    Q    Okay.  What does the CA mean?

23    A    CA means chartered accountants of India.

24    Q    Oh, okay.  So it's -- that's just an

25  accounting degree specific to India?

13

```
 1          A    It's similar to the CPA license in the U.S.

 2          Q    Okay.  And what accounting principles do you

 3    study to obtain that CA certificate?

 4          A    Indian GAAP, generally accepted accounting

 5    policies.

 6          Q    Indian GAAP?

 7          A    Yes.

 8          Q    And then in May of 2021, you obtained a

 9    master's of science in accounting from Indiana Wesleyan

10    University, right?

11          A    That is correct.

12          Q    And was this an online master's program?

13          A    Yes.

14          Q    And what accounting principles did you study

15    at Indiana Wesleyan?

16          A    U.S. GAAP.

17          Q    And was that your first time studying U.S.

18    GAAP?

19          A    Studying, yes.

20          Q    And, Mr. George, do you hold any professional

21    licenses?

22          A    No.

23          Q    So no CPA license?

24          A    No.

25          Q    In your background questionnaire you also
```

14

```
 1    listed your employment history and indicated that you

 2    worked at          in November 28th, 2017 to the present.

 3    Is that correct?

 4         A    Correct.

 5         Q    And           address that you listed here was

 6                             ,              in Boca Raton,

 7    Florida.  Have you -- do you work at that Boca Raton

 8    office for        ?

 9         A    Yes.

10         Q    And from 2017 to the present have you always

11    worked out of the Boca Raton office for

12         A    Yes.

13         Q    And in the course of the COVID-19 pandemic

14    were you working in the office or working remotely?

15         A    I worked remotely three months, then I came

16    back to the office.

17         Q    And when you were working remotely was that

18    out of your home in Parkland, Florida?

19         A    Yes.

20         Q    You list your supervisor here at        is

21    someone by the name of Feng Liang.  Who is mister or Ms.

22    Liang?

23         A    Feng is my current supervisor.  His title is

24    senior vice president of finance and accounting.

25         Q    And how long has Mr. Liang been at        ?
```

15

```
 1        A    He started in Q4 of 2022.  So I don't exactly
 2   remember the date.
 3        Q    Okay, Q4 of 2022?
 4        A    Yes.
 5        Q    And prior to Mr. Liang joining        in Q4
 6   of last year who did you report to?
 7        A    For a period of March 2022 until Feng joined I
 8   was supporting the CFO.
 9        Q    And who was the CFO?
10        A    Jarrod Langhans.
11        Q    And prior to reporting to Mr. Langhans, who
12   did you report to?
13        A    The prior CFO, Edwin Negron.
14        Q    And for how many years did you report to Mr.
15   Negron?
16        A    -- 2018 June until Jarrod joined.
17        Q    And did you start reporting to Mr. Negron when
18   he joined        ?
19        A    Yes.
20        Q    And who did you report to prior to Mr. Negron
21   joining        ?
22        A    The prior CFO, John Fieldly.
23        Q    And during that time was Mr. Fieldly also
24   asking as the acting CEO of
25        A    Yes.  He was the CFO and interim CEO.
```

16

1     Q    And prior to joining          in November of

2    2017, you indicated on your questionnaire that you

3    worked at Global Tower Partners, correct?

4     A    That is correct.

5     Q    And what was your role at Global Tower

6    Partners?

7     A    Senior manager of accounting.

8     Q    And what did you do in that role?

9     A    So I was supervising the general ledger team.

10    Q    What is Global Tower Partners?

11    A    Global Tower Partners is a Boca Raton company

12   engaged in the business of owning telecommunication

13   towers.

14    Q    And in overseeing the general ledger team did

15   you need to understand accounting principles?

16    A    Yes.

17    Q    And what accounting principles did you apply

18   in your role at Global Tower Partners?

19    A    U.S. GAAP.

20    Q    And how did you become familiar with U.S. GAAP

21   for your job at Global Tower Partners?

22    A    Prior to working with Global Towers I was

23   working for a different company in Bahrain where we were

24   using the U.S. GAAP over there and having my years of

25   experience I was able to learn the U.S. GAAP through my

1  career.

2      Q    And that prior position in Bahrain is what's

3  listed here in this background questionnaire Elames

4  Trading and Contracting?

5      A    Yes.

6      Q    And it looks like you left American -- or

7  Global Tower Partners also known as American Tower in

8  2017.

9      A    Global Tower Partners had been acquired by

10 American Towers in 2013, then I became part of American

11 Towers since 2013 to 2017.

12     Q    I see.  Okay.  And what was your reason for

13 leaving American Tower in 2017?

14     A    American Tower had an office in Boca Raton

15 until 2017.  Then they decided to move the operations to

16 another place in the U.S., so I had to leave.  So they

17 closed down the office.

18     Q    And approximately how much time did you have

19 between American Tower and joining       ?

20     A    Just about a month.

21     Q    Avron or Lisa, do you have other questions on

22 the questionnaire?

23         MS. DEITCH:  I don't.

24         BY MS. SPRAGUE:

25     Q    Mr. George, when you joined the       in

```
 1   November 2017, how many other employees were there in

 2   the finance department?

 3        A    Approximately five employees, including

 4   accounts receivable and accounts payable and the general

 5   ledger.

 6        Q    And those -- so there was one person for

 7   accounts receivable?

 8        A    Two persons for accounts receivable, one for

 9   accounts payable and two for the general ledger side.

10        Q    And where did you fall in that, in those three

11   groups?

12        A    In the GL side.

13        Q    And who else worked with you in the GL side?

14        A    Prior to me joining, the (audio disruption)

15   controller, her name was Sandy Telsaint.  So I was

16   working with her for a few months.

17        Q    And when did Ms. Telsaint leave?

18        A    She moved to another department within the

19   organization in 2018, in the quarter two timing.  I

20   don't exactly remember the date.

21        Q    And is that when you became controller?

22        A    Yes.

23        Q    Prior to you becoming controller what was your

24   title at        ?

25        A    I was hired as a controller.  Then I was
```

19

1    actually working with Sandy for a transition period of

2    approximately four to five months.  Then Sandy moved to

3    VP of operations.

4         Q    I see.  So from the beginning you were hired

5    as the controller.  It was just the transition period

6    with Ms. Telsaint for the first few months.

7         A    That is correct.

8         Q    And then did everyone in the accounting

9    department report to Mr. Fieldly?

10        A    No.  Sandy and myself were reporting to

11   Fieldly.  Others in the accounting department were

12   reporting to the controller, either Sandy or myself.

13        Q    So the employee working in accounts receivable

14   and accounts payable reported to you and previously

15   Sandy?

16        A    Correct.

17        Q    And since that 2017-2018 time period has the

18   accounting department grown?

19        A    Yes.

20        Q    And how has it changed?

21        A    We added one more person to the GL team and

22   added one more person to the AR team.

23        Q    And the one additional person on the GL team

24   does he or she report to you?

25        A    Reporting to me, yes.

20

```
 1        Q    And then you said there was one other person
 2   added to accounts payable?
 3        A    No, accounts receivable.
 4        Q    Oh, sorry.  Accounts receivable.  And does
 5   that person report to you as well?
 6        A    No.  We have an AR manager.  That person was
 7   reporting to the AR manager.
 8        Q    And the AR manager in turn reports to you?
 9        A    Correct.
10        Q    And as controller when you were first hired in
11   that 2017 time period what were -- what was your role?
12        A    In 2017, the beginning I was actually
13   supporting the controller like Sandy Telsaint for
14   closing the books.
15        Q    Anything else?
16        A    No.
17        Q    And how did you provide support in closing the
18   books?
19        A    Reviewing their calculations, performing their
20   calculations.
21        Q    And after that transition period when you
22   became the controller what was your role?
23        A    I was supervising the AR team and I was
24   supervising the AP team and I was also supervising the
25   GL team.
```

**EXHIBIT**

**175**

## BACKGROUND QUESTIONNAIRE

**Please respond to the following questions in the space provided. If you need additional space for any response, you may attach additional pieces of paper.**

Today's date: 3/6/2023

1. What is your full name?
   Stephen George

2. Have you ever been known by any other name? Yes __ No ✓

   If yes, list each such name and the period(s) in which you were known by that name.
   N/A

3. Date and Place of Birth?
   ⊂          , Kerala, India

4. Country of Citizenship?
   USA

PRIOR PROCEEDINGS

5. Have you ever testified in any proceeding conducted by the staff of the Securities and Exchange Commission, a U.S. or foreign federal or state agency, a U.S. or foreign federal or state court, a stock exchange, the Financial Industry Regulatory Authority ("FINRA") or any other self-regulatory organization ("SRO"), or in any arbitration proceeding related to securities transactions? Yes __ No ✓

   If yes, for each such proceeding, identify: (i) the title of the proceeding; (ii) the organization or agency; and (iii) the date(s) on which you testified.
   N/A

6. Have you ever been deposed in connection with any court proceeding?
   Yes __ No ✓

   If yes, for each such proceeding, identify: (i) the title of the proceeding, and (ii) the date(s) on which you were deposed.
   N/A

CONFIDENTIAL TREATMENT REQUESTED BY STEPHEN GEORGE

Background Questionnaire
Page 2

_____

_____

7.  Have you ever been named as a defendant or respondent in any action or proceeding brought by the SEC, any other U.S. or foreign federal agency, a state securities agency, FINRA, an SRO, or any exchange?  Yes __ No ✓

If yes, for each such proceeding, identify: (i) the title of the proceeding; (ii) the agency or tribunal; (iii) the substance of the allegations; (iv) the outcome of the proceeding; and (v) the date of the outcome.
N/A

_____

_____

_____

_____

8.  Have you ever been a defendant in any action (other than those listed in response to question 7) alleging violations of the federal securities laws?  Yes __ No ✓

If yes, for each such proceeding, identify: (i) the title of the proceeding; (ii) the court or tribunal; (iii) the outcome of the proceeding; and (iv) the date of the outcome.
N/A

_____

_____

_____

_____

9.  Have you ever been a defendant in any criminal proceeding other than one involving a minor traffic offense?  Yes __ No ✓

If yes, for each such proceeding, identify: (i) the title of the proceeding; (ii) the court or tribunal; (iii) the outcome of the proceeding; and (iv) the date of the outcome.
N/A

_____

_____

_____

_____

CONFIDENTIAL TREATMENT REQUESTED BY STEPHEN GEORGE

Background Questionnaire
Page 3

<u>EDUCATIONAL HISTORY</u>

10. Provide the requested information about each educational institution that you have attended, beginning with the most recent and working backward to the date that you completed high school.

| Indiana Wesleyan University | | | |
|---|---|---|---|
| Name of School | | | |
| Marion | IN | USA | 46953 |
| City | State | Country | Zip Code |
| | | MS Accounting | May 2021 |
| Dates of Attendance: Month/Year to Month/Year | | Degree/Major | Month/Year of Degree |

| Institute of Chartered Accountants of India | | | |
|---|---|---|---|
| Name of School | | | |
| Madras | Tamil Nadu | India | |
| City | State | Country | Zip Code |
| | | CA Intermediate Accounting | May 1993 |
| Dates of Attendance: Month/Year to Month/Year | | Degree/Major | Month/Year of Degree |

| Bishop Moore College / University of Kerala | | | |
|---|---|---|---|
| Name of School | | | |
| Mavelikara | Kerala | India | |
| City | State | Country | Zip Code |
| | | BS Math | May 1990 |
| Dates of Attendance: Month/Year to Month/Year | | Degree/Major | Month/Year of Degree |

| | | | |
|---|---|---|---|
| Name of School | | | |
| | | | |
| City | State | Country | Zip Code |
| | | | |
| Dates of Attendance: Month/Year to Month/Year | | Degree/Major | Month/Year of Degree |

11. Other than courses taken in connection with institutions listed in response to question 10, list any securities, accounting or business related courses taken since high school.  For each such course, identify the date that the course was completed and the name of the institution or organization that offered the course.

N/A

CONFIDENTIAL TREATMENT REQUESTED BY STEPHEN GEORGE

Background Questionnaire
Page 4

<u>PROFESSIONAL LICENSES/CLUBS</u>

12. Do you hold, or have you ever held, any professional license?  Yes__ No ✓

If yes, for each such license, identify: (i) the license number or attorney bar number;
(ii) the licensing organization; (iii) the date the license was awarded; (iv) the date such
license terminated, if applicable; (v) the date(s) of any disciplinary proceeding(s) against
you: and (vi) the outcome of any such disciplinary proceeding (*e.g.*, reprimand,
suspension, revocation).

N/A

13. Are you, or have you ever been, a member of any professional or business club or
organization?   Yes __  No ✓

If yes, list for each: (i) the name of the club or organization; (ii) its address; (iii) the
date(s) of your membership; and (iv) service in any governance roles (*e.g.*, board
member, committee member, etc.) including title and dates of service.

N/A

14. Are you, or have you been in the last three years, a member of any social clubs, charities
or nonprofit organizations?   Yes ✓   No ____

If yes, list for each: (i) the name of the social club, charity or nonprofit organization;
(ii) its address; (iii) the date(s) of your membership; and (iv) service in any governance
roles (*e.g.*, board member, committee member, etc.) including title and dates of service..

Mizpah Church,                      Parkland, Florida 33076, 2014 - Present, Treasurer

CONFIDENTIAL TREATMENT REQUESTED BY STEPHEN GEORGE

Background Questionnaire
Page 5

<u>EMPLOYMENT HISTORY</u>

15. Are you, or have you ever been, an employee of a broker, dealer, investment adviser, investment company, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization?   Yes \_\_\_   No ✓\_\_

If yes, list for each: (i) the jurisdiction of the entity; (ii) your CRD number; (iii) the entity's CRD number; (iv) the entity's SEC File number; (v) the entity's CUSIP number; and (vi) any foreign registration information similar to the foregoing.

N/A
_____
_____
_____
_____
_____
_____
_____

16. State your employment activities, beginning with the present and working backward to the date that you completed high school and attach a recent copy of your resume or curriculum vitae.

| Employer's Name/Self-Employment | | | |
|---|---|---|---|
| Z | | | |
| Employer's Street Address | | | Telephone Number |
| Boca Raton | FL | USA | 33431 |
| City | State | Country | Zip Code |
| Controller | 11/28/2017 - Current | | Feng Liang |
| Title | Dates of Employment | | Supervisor |
| | | | |
| Title | Dates of Employment | | Supervisor |
| | | | |
| Title | Dates of Employment | | Supervisor |
| | | | |
| Title | Dates of Employment | | Supervisor |

CONFIDENTIAL TREATMENT REQUESTED BY STEPHEN GEORGE

Background Questionnaire
Page 6

Global Tower Partners/American Tower (AMT)

| Employer's Name/Self-Employment | | | |
|---|---|---|---|
| 7 | | . | |
| Employer's Street Address | | | Telephone Number |
| Boca Raton | FL | USA | 33487 |
| City | State | Country | Zip Code |
| Sr.Manager Acccounting | | | Lisa A. |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |

Elames Trading & Contracting

| Employer's Name/Self-Employment | | | |
|---|---|---|---|
| Employer's Street Address | | | Telephone Number |
| Ma'ameer | Sitra | Bahrain | |
| City | State | Country | Zip Code |
| Sr. Accountant | | | Fawz Behzad |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |

| Employer's Name/Self-Employment | | | |
|---|---|---|---|
| Employer's Street Address | | | Telephone Number |
| City | State | Country | Zip Code |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |

CONFIDENTIAL TREATMENT REQUESTED BY STEPHEN GEORGE

Background Questionnaire
Page 7

| Employer's Name/Self-Employment | | | |
|---|---|---|---|
| Employer's Street Address | | | Telephone Number |
| City | State | Country | Zip Code |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |

| Employer's Name/Self-Employment | | | |
|---|---|---|---|
| Employer's Street Address | | | Telephone Number |
| City | State | Country | Zip Code |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |
| Title | Dates of Employment | | Supervisor |

CONTINUE ON ADDITIONAL SHEETS IF NECESSARY

CONFIDENTIAL TREATMENT REQUESTED BY STEPHEN GEORGE

DOCUMENTS CITED BY

DEFENDANT STEPHEN GEORGE

# EXHIBIT E



**Finance & Accounting**

Edwin Negron CFO

Stephen George VP, controller
General Ledger, SOX, Audit, Monthly reporting
email:sgeorge

**Aida Washington -AR Manager**
Paul Milazzo
Beverly Edwards
email id:a
Tel:

Josh Aronin
Financial Planning & Analysis Manager
Budgeting,forecasting,new customer setup,CM model,Promo calander
Weekly sales flash report
Month-end closing

Shaneika Mohammed - AP Manager
Rivkah Saenz
email: ap

Customer Order processing
Collections
Credit check/Credit hold
TPR/Bill back/deduction process
Sending invoices to customers
Sending statements to customers

Ivan Torres - Sr. Accountant
DSO reporting
General ledger
Bank reconciliation
Month-end closing process

Employee Expense report,
Broker commission, Slotting/rebate invoices
1099 employee payment process
Payroll and  regular accounts payable functions

# EXHIBIT G



V. 3/1/2023

CONFIDENTIAL TREATMENT REQUESTED BY

CEL-DOJ-00000008

# EXHIBIT I



9:39

‹ 66          J          ▢

**John Fieldly** ›

Feb 23, 2023 at 9:30 PM

Good evening John, sorry to text you so late. I just wanted to inform that I have decided to resign from ▭ tomorrow. I'll send the official letter tomorrow, but just wanted to let you know first. Thank you very much for the wonderful opportunity, and it was a pleasure working with you and I will always cherish it. And always, ▭

Feb 24, 2023 at 6:13 AM



Text Message